**STATE of Tennessee**

v.

**David G. HOUSLER, Jr.**

Supreme Court of Tennessee.

Feb. 2, 2006 Session.

May 19, 2006.

Michael E. Terry, Nashville, Tennessee, for the appellant, David G. Housler, Jr.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; and Joseph F. Whalen, Associate Solicitor General, Nashville, Tennessee, for the appellee, State of Tennessee.

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ. joined.

Pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure, we granted review principally to determine whether the State violated the Appellant's Due Process rights (1) by introducing into evidence at his murder trial the Appellant's confession, which contained several known falsehoods, or (2) by advancing allegedly inconsistent theories, arguments, and facts in the Appellant's and his co-defendant's respective prosecutions. We hold that a criminal defendant's confession may be used against him consistent with Due Process protections even when the confession contains peripheral facts known by prosecutors to be false. Further, we hold on the facts presented to us in this case that the State did not pursue inconsistent prosecutions in the respective trials of the Appellant and his co-defendant and that, therefore, we need not address whether a criminal defendant's Due Process rights could be violated by such inconsistency.

## FACTUAL BACKGROUND

On January 30, 1994, officers of the Clarksville, Tennessee, Police Department discovered the bodies of Kevin Campbell, Angela Wyatt, Patricia Price, and Marcia Klopp inside a Taco Bell restaurant. Each of the four victims, all of whom were employees of the restaurant, suffered multiple gunshot wounds. Officers also discovered that a safe in the business office of the restaurant had been blown open by a shotgun blast and emptied of nearly $3,000 in cash and coins.

The crime garnered local outrage and national media attention, and within days Courtney B. Mathews, a newly-hired part-time employee of the restaurant, was arrested and charged with the murders and robbery. Mathews was also a military soldier stationed at nearby Fort Campbell, Kentucky.

Work records showed that on January 29, 1994, Mathews clocked in to work at 2:10 p.m., clocked out for a break at 7:39 p.m., clocked back in at 8:12 p.m., and ended his shift at 9:11 p.m.

Mathews resided on Ryder Avenue in Clarksville, four to five miles from the Taco Bell on Riverside Drive. According to Carl Ward, Mathews' roommate at the time, Mathews arrived home from work at 9:30 p.m. on the night of the murders and went into his room where he placed a shotgun, a .9 millimeter handgun, and either a .22 or .25 handgun, along with shells and ammunition, in a book bag. Mathews also grabbed a bowling-ball bag and a pair of white latex gloves and left the apartment alone. Ward testified that when Mathews left the house, he was wearing two layers of clothes—a Miami Hurricanes sweat suit underneath black pants, a white shirt and a tie, and a black three-quarter length coat. Before he left, Mathews told Ward, who had been examining the guns, to wipe his prints from them.

About an hour after Mathews left work on the evening of January 29, a Taco Bell employee, Jelaine Walker, saw Mathews inside the restaurant again. Walker observed Mathews crouching behind a trash can in the dining area. Mathews said to Walker, "I am gone, you don't see me." Company policy prohibited entry of anyone into the restaurant once the dining area was closed at midnight; the drive-through lane generally remained open until 1:00 or 1:30 a.m.

Investigation of the crime scene revealed a disrupted ceiling tile in the men's bathroom that appeared to have been moved to create an opening after someone had been hiding above. A forensic specialist from the Tennessee Bureau of Investigation (TBI) later confirmed that Mathews' fingerprints were on a fan vent near the displaced tile.

Witness Frankie Sanford placed an order from the drive-through lane of Taco Bell at 1:30 a.m. on the day of the murders. Inside the restaurant he saw, alive and well, each of the four victims working as normal; he also saw Mathews, in uniform, working.

When John Ballard, a shift manager at the Taco Bell, stopped by the drive-through window at approximately 1:45 a.m., the employees were engaged in normal closing activities. Klopp, the evening manager at Taco Bell on the night of the killings, told Ballard that they had been very busy and hence were unable to close the drive-through window until 1:30 a.m. Ballard left the restaurant around 2:00 a.m.

Witness Allen Ceruti, who at the time was employed by the Tennessee Department of Correction, drove by the Taco Bell at 4:30 a .m. on the day of the murders. He testified that he saw an African–American male partially open the metal rear door of the Taco Bell restaurant from the inside. Mathews is African–American.

When Ballard arrived later the next morning at approximately 7:25 a.m. to open the restaurant, he noticed that the employees' cars were still in the parking lot. After unlocking the main entrance, Ballard entered the Taco Bell and discovered one of the victim's bodies. He left and immediately called 9–1–1. Police arrived shortly thereafter, performed a sweep of the building, and found the bodies of the four victims inside. TBI agents were soon called to collect evidence from the crime scene.

In the general work area of the restaurant, twenty-four cartridge cases, all fired from a .9 millimeter gun, were recovered. Eight fired bullets were also found lodged in various places throughout the restaurant. Investigators determined that the cartridge cases, the fired bullets, and the bullet fragments recovered from the victims' bodies were all fired from the same .9 millimeter gun. The office safe had been broken into after the combination dial was shot off. According to forensic investigators, two different guns, a shotgun and a .9 millimeter, had been used to shoot the safe. Found inside the business office of the restaurant were a Federal brand lead-slug shot shell case, lead fragments from the slug, and an unfired Federal lead-slug shot shell—along with plastic fragments from the safe dial. An audit later revealed that exactly $2,967.68 had been taken from the restaurant.

On the day of the murders, David Lee Rose was working at the McDonald's near I–24 in Clarksville. While he was emptying the trash, he discovered inside several unfired .12 gauge shotgun shells and numerous .9 millimeter bullets (some of which had been chambered in a weapon), some coins in wrappers, a black wallet, and a black leather glove. He also disposed of two half-eaten hamburgers that were in the bag with the other items. Rose took the ammunition and change home with him. He did not keep the glove or the wallet. When Rose learned about the murders, he returned the shells and bullets to his store manager. Investigators later determined that the chamber markings on the shotgun shells that Rose found matched those on the shotgun shells collected from the crime scene. The chamber markings on the .9 millimeter bullets that he found, however, did not match those found on the bullets collected from Taco Bell. A search of Mathews' car yielded a bowling ball bag containing $2,576 along with a collection of credit and identification cards strewn about the car's interior.

Investigators of the Clarksville Police Department searched for evidence along the interstate. Underneath the Red River Bridge on I–24, they collected several

items of clothing, pieces of a latex glove, and other sundry items. One of the clothing items recovered was a three-quarter length black jacket. Forensic investigators determined that a stain on the jacket was the blood of victim Kevin Campbell. Also, plastic fragments lodged in the coat were determined to be of the same type plastic as the plastic dial blown off the safe.

Ward, Mathews' roommate, identified the coat as the one that Mathews was wearing on the night of the murders; he also testified that he had not seen the coat since that time and that Mathews, when he left their apartment on the night of the murders, said that no one would see the clothes he was wearing again. Ward further stated that on the following Tuesday after the murders, Mathews attempted suicide in their apartment. On this evening, Mathews told Ward, while crying, "I don't deserve to live. I killed four people."

Between the Sunday of the murders and the Tuesday that Mathews attempted suicide, Mathews told Shawntea Hooks, Ward's then-girlfriend, how he believed the perpetrator committed the crime:

> Well, he told me that whoever did it, they went into the Taco Bell before it closed. They went into the men's bathroom and climbed into the ceiling, waited until the store closed. They came down ... and he said they killed two people in the front of the store and two in the back.

Shawn Peghee worked with Mathews at Fort Campbell in the mailroom. On the Friday before the murders, Mathews asked Peghee questions about the safe in the mailroom and whether one would be able to get inside by shooting it. According to Peghee, as Mathews left the mailroom, "he sort of looked back at me with a smile on his face, sort of a smirk, and he said something big was going to happen that weekend."

During the time that Mathews worked at Taco Bell, he asked Assistant Manager Deann Rivaf if anything was stored in the ceiling.

Fitz Dickson, who had known Mathews for eleven years, testified that he purchased a .9 millimeter gun for Mathews in 1993. Dickson also testified that he saw Mathews buy ammunition for the gun on the same day that he purchased it for him.

During a search of Mathews' residence, investigators recovered several bullet fragments that Mathews had fired into the floor of his bedroom during an argument with his estranged wife sometime before the murders. Investigators also collected several unfired rounds. A TBI forensic scientist testified that a cartridge case and numerous bullet fragments recovered from Mathews' apartment came from the same .9 millimeter weapon as the cartridges and bullets recovered from the crime scene and the victims' bodies. Shells provided to investigators by Shawn Depto, who loaned Mathews a shotgun and some shells, had the same chamber markings as those recovered at McDonald's. On November 21, 1995, a plastic bag containing a disassembled Winchester shotgun was found behind Mathews' residence. After reassembling the shotgun, forensic examiners determined that the lead slug used to shoot open the Taco Bell safe was fired from this shotgun. The shells provided by Depto and those recovered from McDonald's also matched the slug and shells collected from Taco Bell. Depto also identified this shotgun as the one he loaned Mathews.

In June 1994, a jury convicted Mathews of the robbery of the Taco Bell and the murders of the four employees. He was sentenced to life imprisonment without parole.

On March 7, 1994, TBI Agent Jeff Puckett and Detective George Elliott of the Clarksville Police Department interviewed David G. Housler, Jr., at Fort Campbell, Kentucky. Housler was also a solider stationed at Fort Campbell; at the time, he had been detained by military authorities for being absent without leave. Detective Elliott suspected Housler of an unrelated robbery that occurred in front of Grandpa's Hardware Store in Clarksville about a week before the Taco Bell murders. During the course of the interview, Housler denied involvement in the Taco Bell murders and stated that on the night of the killings he attended a party with friends at Kevin Tween's mobile-home trailer in Oak Grove, Kentucky. His best recollection was that he stayed there all night with his girlfriend, Sulyn Ulangca. He also stated that on January 21, a week and a day before the murders, he and Sulyn may have attended a party at the same trailer; he further stated that he did not personally know Mathews and did not meet him at that particular party. He denied any role in the robbery outside the Grandpa's store as well. Housler was later arrested for that robbery.

While in jail on the aggravated robbery charge, Housler informed his lawyer, Larry McMillan, that he had information about the Taco Bell murders. McMillan negotiated an agreement with Clarksville District Attorney General John Carney that Housler would provide information and serve as a witness against Mathews in return for a reduced bond and a lesser charge for the Grandpa's robbery. Housler gave a statement on March 21, 1994, outlining the following: He met Mathews during a party at the trailer in Oak Grove, Kentucky on January 21, 1994. Mathews said in the presence of several people, including Housler, that he had a place to rob—his place of work—and that when he did it, he would not leave any witnesses. He also stated that once he committed the robbery, they could read about it in the newspapers. Housler said that he did not see Mathews again until March 15, when the two were in jail. Housler claimed that Mathews admitted committing the Taco Bell murders and giggled about it. Mathews also claimed to have attempted suicide while in jail. Housler also mentioned that his first statement to investigators on March 7 was not truthful because he did not want to get involved. After giving this statement on March 21, Housler was released on bond, and he returned to Kentucky.

During October 1994, prosecutors asked Housler to return to Clarksville to resolve some inconsistencies between his statements and information gathered from other sources. On October 11, Housler admitted to "gassing up"[1] Mathews to commit the robbery. Apparently, at this point Housler's status changed from witness to suspect. On October 19, prosecutors entered into a proffer agreement with Housler whereby Housler would receive a recommended sentence of fifteen years for conspiracy to commit murder and four years for the unrelated robbery, to be served concurrently, in return for providing truthful information about the Taco Bell murders and serving as a witness against Mathews.

On October 20, 1995, Housler and his attorney met again with Carney and others. During this interview, Housler gave a written statement, which relayed the following information: Housler met Mathews at the trailer in Kentucky about a week before the Taco Bell murders. At the party, Mathews, Housler, and Charlie Brown talked about robberies and other

---

1. That is, to encourage or persuade Mathews to commit the crimes.

crimes that each had committed. Housler said that he bragged about committing the robbery outside Grandpa's. Mathews brought up the idea of robbing the place where he worked. Mathews said he would go in and leave no witnesses. Housler told Mathews that he doubted he would commit the crime but, if Mathews would, he would go with him. When Housler asked Kevin "Red" Tween if he knew about the plan, Tween responded, "[W]hatever, whenever." Melanie Darwish then approached Housler and Mathews and said she would participate as well. Housler stated that Mathews was carrying a .9 millimeter handgun under his clothes at this party. On January 29, 1994, Housler arrived with Sulyn Ulangca at the trailer around nightfall. Mathews was in the trailer with Tween, Darwish, Kendra Corley, and Dana Ulangca (Sulyn's brother). Tween told Housler that "tonight is the night" for robbing the Taco Bell, and he asked Housler to get some ammunition. Housler left the trailer and visited someone called "Hippie Dude," who sold him a box of shotgun shells and box of .9 millimeter bullets. Housler returned to the trailer at around 11:00 p.m. Dana Ulangca was asleep, and Kendra Corley had left. Sulyn immediately pleaded with him not to participate in the robbery. While Houser argued with her, the others started to plan the robbery and killings. Housler did not hear the details. By the time Housler's argument with Sulyn ended, the group was ready to leave. Housler drove his white Tracer, and Darwish drove her red Tempo. Tween was wearing a dark-blue hooded jacket and blue jeans, and Mathews was wearing a black knee-length jacket. The group stopped at the Minit Mart for beer and cigarettes. On the ride to Taco Bell, Mathews told Tween to get the register, and he would take care of the safe. Tween had a .9 millimeter pistol, while Mathews seemed to have the shotgun—a twenty-four inch Mossberg pump—stuffed under his coat. However, during the drive, Mathews told Housler that Corley placed the guns in a trash can at the restaurant where they would be available to him. Housler had his .9 millimeter handgun.

Housler also related in his written statement that, upon arriving at the Taco Bell, he pulled up to the drive-through window. Mathews exited the car and tapped on the window, which was opened by a heavy-set woman with brown hair. Mathews stated that he needed to get inside to retrieve his wallet or driver's license. During this time, Housler saw Darwish's car in the mall parking lot. Tween then told Housler to keep the car running and that if anyone pulled up to the restaurant to honk the horn twice and leave. Tween got out of the car and ran behind the dumpsters. Housler decided not to go inside because he was fighting with Sulyn. He pulled up parallel to the main double doors of the restaurant. Housler saw Mathews and the woman walk toward the counter area near the bathrooms. After about twenty minutes, he heard ten to fifteen loud pops from inside the building, which lasted for about two to three minutes. After the pops stopped, Housler heard a loud bang, which "sounded like a metal door being swung open[,]" and within seconds he saw Tween run from behind the Taco Bell to the dumpsters. Next, he heard a similar bang and then saw another person exit the Taco Bell and run in the direction of the dumpsters. He put the car in gear and drove, almost hitting an older model Chevelle with a Tennessee license plate starting "DFN." He stated that Darwish drove the getaway car with Tween and Mathews inside. Housler drove to the nearby Dingo Boot parking lot, where the group had previously agreed to meet. Darwish pulled up soon after with Mathews and Tween. Mathews got out of Darwish's car,

opened the trunk, and threw in the shotgun and a Taco Bell bag; Tween got out and threw in his pistol. Housler then asked Tween what happened. Tween said Mathews took all the employees in the back and "flipped out." Tween told Housler to leave, and Housler returned to the trailer. Tween and Darwish arrived at the trailer about thirty minutes later without Mathews. Housler asked where his cut of the money was, and Tween said that Mathews would bring it later. Tween also said that Mathews shot the victims in the head "gangster-style" to ensure that they were dead. Housler left the trailer an hour later, telling Tween to wait there for his cut of the money. Housler mentioned that Mathews said that he got $1,500 from the robbery. Housler drove to Jennifer Ellis's house and stayed there until 6:00 p.m. that same day. He went back to the trailer and asked Tween for his money, but Tween said that Mathews had not returned. Housler left his car on the road where Jennifer Ellis lived because he thought it would be connected to the murders. He believed that police later impounded his car. Housler stated he did not see Mathews again until they met in jail.

Investigators contacted Sulyn Ulangca in North Carolina; she could not corroborate Housler's statement. When Ulangca returned to Tennessee to confront Housler, he did not want to see her and confessed to implicating an innocent person. Prosecutors informed Housler that he had breached the agreement and that they were revoking it. Housler then attempted to run but was caught and taken to jail. Prosecutors immediately sought an indictment from the grand jury based on his October 20 written statement.

On November 7, 1995, Housler was charged with four counts of premeditated murder, four counts of felony murder, and one count of especially aggravated robbery. The State filed a notice of intent to seek the death penalty. The State later withdrew its notice and filed notice of intent to seek life without parole. On September 3, 1997, the State obtained a superseding indictment, which charged only four counts of felony murder.

Housler's trial was held November 12 through 21, 1997, more than a year after Mathews' trial. Because Mathews' prosecutors were potential witnesses in the Housler trial, a different prosecutor, District Attorney General Robert "Gus" Radford, conducted the State's case against Housler.

From our reading of the Housler trial transcript, it appears that General Radford's strategy was (1) to establish Mathews' guilt in committing the Taco Bell robbery and murders by using many of the same witnesses and much of the same evidence that the prosecution used at Mathews' trial and (2) to establish Housler's guilt in the same crimes by using his written statement, which placed him with Mathews as a lookout on the night of the killings, and with the testimony of several corroborating witnesses.

Housler objected to the introduction of his written confession at trial on the ground that it was substantially false. The trial judge overruled this objection, and the statement was admitted. During their respective testimonies at trial, both District Attorney General John Carney, a prosecutor at Mathews' trial, and TBI Agent Jeff Puckett, who took Housler's statement, admitted that significant portions of Housler's statement were false. Carney admitted that he presented evidence at Mathews' trial that Mathews purchased all the ammunition used in the crime. This evidence conflicted with Housler's story that he purchased the ammunition from "Hippie Dude"; in fact, in-

vestigators contacted "Hippie Dude" in Michigan, and he denied Housler's account. Carney admitted to arguing that Mathews hid in the ceiling of the Taco Bell, which conflicted with Housler's account that Mathews got inside the restaurant by saying he needed to retrieve his wallet and that he left after fifteen to twenty minutes. Carney admitted that Housler's statement that Mathews was at the trailer on January 21 was not true—in fact, Taco Bell records showed that Mathews was at work at that time. Carney admitted that Housler implicated innocent people, most notably Sulyn. Carney stated that Minit Mart could not verify that Housler, Tween, and Mathews entered the store on the night of the murders. Agent Puckett testified that he did not consider truthful Housler's statement that Mathews and Corley were at the trailer at dusk on January 21 because their respective employers' records showed that they were both at work during that time. Puckett also admitted to testifying at Mathews' trial that the Hippie Dude story could not be confirmed. He further conceded that the Grandpa's robbery occurred on January 23 and that therefore Housler's story that he bragged about it on January 21 was false.

Relevant portions of the testimony presented at Housler's trial included the following: Michele Antaya testified that on January 29, 1994, at approximately 11:15 p.m., she stopped at the Taco Bell drive-through window. According to Antaya, she saw an African–American male walk from behind the Taco Bell dumpsters toward her car. She described him as around five feet ten inches tall, stocky, and with short hair shaved on the sides. She testified that he was wearing a dark jacket with a hood and dark pants. This description matched Mathews.

Yowanda Maurizzio went through the Taco Bell drive-through at about 1:15 a.m. on January 30, 1994. She observed a black male speaking with a black female inside the restaurant. Only one other African–American male besides Mathews was employed at the restaurant, and he was not on duty the day of the murders.

Frankie Sanford testified that he was at the Taco Bell drive-through about 1:30 a.m. on January 30. He said that he saw Mathews dressed in his Taco Bell uniform working inside the restaurant.

Jacqueline Dickinson stopped at a traffic light in front of the Taco Bell around 2:40 a.m., looked into the restaurant, and saw a white male at the counter looking toward the Long John Silver's lot next door. According to Dickinson, the man was wearing a long green jacket with a big hood and a dark pair of jeans. She described the man as five feet nine inches to six feet tall, medium build, with short hair brown hair cut in a military style. She also saw in the Taco Bell parking lot a white car "facing inward towards the building." The car was not in the same position as a white car owned by one of the victims that was parked there that night.

Damien Cromartie stopped at the Taco Bell around 3:00 a.m. He observed a few vehicles in the parking lot and a brown or burgundy sedan parked in the Two Rivers Mall parking lot behind the Taco Bell. When he pulled into the drive-through lane, he saw a large piece of cardboard in the window. On the cardboard he saw the silhouettes of two or three people moving around inside the restaurant.

Bill Hudspeth testified that, between 2:00 and 2:30 a.m. on January 30, 1994, he drove by the Taco Bell and saw a white male run diagonally from an area behind the restaurant to the front of his car and then toward a muffler shop across the street. Hudspeth described the male as

between five feet nine inches and six feet tall, with short hair, and a stocky build. Hudspeth said another white male with short hair, a stocky build, and a bit taller than the other individual was standing near the muffler shop.

Mark Jolly testified that he was in the Shoney's parking lot across the street from the Taco Bell between 2:30 and 3:00 a.m. on January 30, 1994, when he heard two loud bangs and saw a man running from the back of the Taco Bell. According to Jolly, the man was a Puerto Rican or a light-skinned African–American male, wearing shorts, and carrying something rolled up in a brown bag in his left hand. After he saw the man, Jolly observed the lobby lights in the Taco Bell flicker on and off two or three times.

Allen Ceruti testified that he passed by the Taco Bell between 4:20 and 4:30 a.m. He observed an African–American male standing at the open back door.

Charlie Brown testified that Mathews and Housler were both at a party together at the trailer in Oak Grove, probably on January 21. During his testimony, Brown recanted a statement he made in November 1995, wherein he said that he heard Mathews talking about robbing the place where he worked.

Melanie Darwish testified that she may have lent her car to Housler on the night of the robbery and murders, although she was not sure. According to Darwish, she was at home in bed on that night. Darwish said that Mathews had been at a party at the trailer; however, she did not remember Housler being there.

Lopez Gaddes, a convicted drug trafficker, was in the Montgomery County Jail with Housler in 1994. Housler told Gaddes that he knew Mathews and that Housler, Charlie Brown, and Mathews had conversations about robbing the Taco Bell.

Housler told him that the first conversation about the robbery took place at a party a week or two before the murders. Housler also told Gaddes that the group again talked about committing the robbery at the barracks. When Gaddes asked Housler if he was scared, Housler responded that he was not because Mathews acted as the trigger man.

Jason Carr testified that he was incarcerated with Housler in the Montgomery County Jail during March 1994. During a card game with Housler and Charlie Brown, one of the two men (he could not remember which) stated that Housler's car was used in the getaway of the Taco Bell murders.

Larry Underhill, another inmate, testified that Housler told him, while the two were in jail, that he killed the Taco Bell employees. Underhill said that Housler told him that the victims were shot execution-style. Housler also asked Underhill about the possibility of redemption for sin.

Christopher Ester, a convicted felon, frequently visited the trailer in Oak Grove. Ester testified that he saw Mathews at the trailer on January 29, 1994. Mathews talked about the robberies he had committed. According to Ester, Mathews and Housler had a conversation that night. Ester testified that Mathews left the trailer around 12:30 or 1:00 a.m. and that Housler left about 2:30 or 3:00 a.m. after he and Ulangca got into an argument. Housler was supposed to call and let the group know his whereabouts, but he never did.

Orlando Gill also visited the trailer. He believed that he met Mathews the weekend before the murders, when Kendra Corley brought Mathews to the trailer. He observed Housler and Mathews conversing in the kitchen.

Hector Ortiz also saw Mathews at the trailer with Corley before the murders. He likewise observed Mathews and Housler conversing. Ortiz was at the trailer on the night of the murders, and he saw Housler and Ulangca there but not Mathews. When he left around 1:00 a.m., neither Housler nor Ulangca was present in the trailer. When he returned to the trailer around 2:30 or 3:00 a.m., the couple still was not there.

Kendra Corley testified that Mathews did not go to a party at the trailer on January 21, 1994, because he was working. Corley stated that she did bring Mathews to the trailer on Saturday, January 22, and they arrived between 9:30 and 10:00 p.m. Corley stated that she did not go to the trailer with Mathews on January 28. According to Corley, Mathews gave her $255 in five-dollar bills just before his suicide attempt. Corley also identified the black jacket as belonging to Mathews.

James Bowen testified that Corley brought Mathews to the party a week before the murders. Bowen overheard Housler and Mathews discussing the robbery of Taco Bell. According to Bowen, Housler and Mathews argued over who would do the shooting and who would be the lookout. Bowen testified that Mathews stated they would rob Taco Bell because, since Mathews worked there, it would be easier for them. Bowen stated that he saw Housler and Ulangca go into the trailer's bedroom about 2:00 a.m. and that they were still there when he woke up.

Housler testified in his own defense. He denied any involvement in the robbery and murders. He asserted that his October 20 statement was wholly false and concocted from jailhouse rumors and newspaper reports. Housler claimed that in order to get out of jail he lied about knowing of Mathews' involvement in the crimes. He also asserted an alibi defense, saying that he was with Sulyn the entire night of the murders.

At trial, Sulyn Ulangca now claimed that Housler was with her on the night of the murders. But she also admitted that she previously was unable to account for Housler's whereabouts on the night of the killings.

Following the conclusion of the evidence, the jury found Housler guilty on four counts of felony murder and imposed a punishment of life imprisonment. After a sentencing hearing on December 12, 1997, the trial court ordered Housler's sentences to be served consecutively. Following extensive filings by both parties and three hearings on Housler's motion for a new trial, proceedings on the motion were completed on July 3, 2000. On February 5, 2002, the trial court summarily denied Housler's motion for a new trial. Housler filed a timely appeal; the Court of Criminal Appeals ruled against him on every issue he presented, most of which are the same or similar to those he argues here.

## ANALYSIS

The Appellant alleges several distinct violations of his State and federal Due Process rights stemming chiefly from the introduction into evidence of his confession. First, the Appellant notes that prosecutors knew that many facts in his confession were false and argues that the State cannot knowingly use any false evidence against him—even when such false evidence is part of his own confession. Second, the Appellant argues that prosecutors unconstitutionally pursued "inherently factually inconsistent theories" in his and Mathews' respective trials. The Appellant also argues that he is entitled to a new trial because a prosecution witness recanted his testimony. Finally, the Appellant

claims convincing evidence of "actual innocence."

We begin our analysis of these claims by noting that the due process protections afforded to criminal defendants by article I, section 8 of the Tennessee Constitution mirror the protections afforded by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *Gallaher v. Elam*, 104 S.W.3d 455, 463 (Tenn.2003).

## A. PROSECUTORS' KNOWING USE OF FALSE EVIDENCE

■ Relying mainly on *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Appellant argues that prosecutors' knowing use of false evidence "of any type" at trial violates Due Process guarantees. Thus, the Appellant claims that prosecutors' knowing use of his confession, which contained many facts known to be false, violated his constitutional rights.[2]

We agree with the Court of Criminal Appeals that *Mooney* and *Napue* are distinguishable from, and not applicable to, the present case. Both *Mooney* and *Napue* concerned prosecutors' knowing use of perjured *witness* testimony, not the use of a defendant's confession. "[I]n an adversary system it is fair to permit the trier of fact to consider a party's statements in resolving issues about that party." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8–06[2] (5th ed.2005). Indeed, the concerns that animated the Court's decisions in *Mooney* and its progeny differ significantly from concerns that arise with the use of the defendant's own statements. Most notably, perjury will not, for obvious reasons, be a central concern when considering a rational defendant's freely-given confession. As we explain below, the primary concern when admitting confessions into evidence is not perjury, but voluntariness. Furthermore, as we also explain below, when the truth or falsity of the defendant's voluntary confession is at issue, it is a question for the jury. Moreover, when the defendant's guilt is genuinely at issue, it cannot plausibly be argued, as the Appellant argues here, that the confession *itself* is known to be false. In this case, the evidence demonstrates the falsity only of many peripheral *facts* in Housler's statement—for instance, the time that the murders occurred or the precise date that Mathews and Housler discussed the robbery at the trailer. The evidence does not demonstrate what the Appellant would have to show for this argument to have at least some plausibility—namely, that his confession to serving as a lookout was false. Only if the prosecutor had known that the Appellant was innocent of the crime would his confession arguably be inadmissible under *Mooney* and its progeny—but of course, if that were the case, the prosecutor should not have charged him with a crime. We think it clear that *Mooney* and *Napue* do not apply to a criminal defendant's confession.

■ We recognize that Housler's confession contained many known factual falsehoods—such as the precise date Mathews and Housler planned the crime during a party at the trailer park, the time of the killings, and (perhaps) who acquired the ammunition used in the killings. In an-

2. We do not interpret the Appellant's argument to mean that the prosecutor knew that Housler was innocent, but rather only that Housler's confession was so inundated with known falsehoods that its veracity should have been doubted by the prosecutor and charges not been brought. But as we explain below, the truth or falsity of the Appellant's confession was a question for the jury.

swer to the Appellant's argument that these known falsehoods rendered the confession constitutionally infirm as evidence, we think it apparent that Due Process here merely required (1) the trial judge to find, by a preponderance of the evidence, that the defendant confessed voluntarily and (2) the confession be minimally corroborated as required by *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and the attendant Tennessee cases cited below.[3] Once these two conditions were satisfied, the truth or falsity of the Appellant's confession, despite the known factual errors it contained, was a determination for the jury. *Wynn v. State*, 181 Tenn. 325, 329, 181 S.W.2d 332 (1944) ("A confession being admitted, its weight is of course a matter for the jury. That is, the jury is to determine whether defendant made the confession and whether the statements contained in it are true.").

 "It is a fundamental doctrine of substantive criminal law that the confessions ... of a criminal defendant, assuming that they are voluntary, are admissible in evidence." *Laumer v. U.S.*, 409 A.2d 190, 197 (D.C.1979) (citing *Wong Sun*, 371 U.S. at 488–89, 83 S.Ct. 407; *Smith*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; *Opper*, 348 U.S. at 88–90, 75 S.Ct. 158). Of course, the admissibility of evidence is a question for the trial judge, not the jury,

*Lego v. Twomey*, 404 U.S. 477, 490, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and in making the voluntariness determination, the trial judge is to be "uninfluenced by the truth or falsity of the confession." *Lego*, 404 U.S. at 484, 92 S.Ct. 619. In other words, "the exclusion of unreliable confessions is not the purpose that a voluntariness hearing is designed to serve. The sole issue ... is whether a confession was coerced. Whether it be true or false is irrelevant; indeed, such an inquiry is forbidden." *Lego*, 404 U.S. at 484 n. 1, 92 S.Ct. 619. Rather, the voluntariness determination "was designed to safeguard the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances." *Lego*, 404 U.S. at 485, 92 S.Ct. 619. The Court made clear in *Lego* that, while the trial judge determines whether the confession was given voluntarily, *the jury assesses the truth or falsity of the statements made:*

> [The voluntariness inquiry] [i]s not aimed at reducing the possibility of convicting innocent men ... [nor is it] based in the slightest on the fear that juries might misjudge the accuracy of confessions and arrive at erroneous determinations of guilt or innocence.... *Nothing [in the voluntariness inquiry] question[s] the province or capacity of juries to assess the truthfulness of confessions....*

92 U.S. at 484–85 (emphasis added). The trial court found that the Appellant's confession here was voluntarily given, a ruling

---

**3.** The Appellant's brief also implies that the confession was an inappropriate basis for bringing charges before the grand jury. But, of course, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). Housler's voluntary confession provided probable cause to issue the indictment. *Commonwealth v. Villalta–Duarte*, 55 Mass.App.Ct. 821, 774 N.E.2d 1144, 1147 (2002) (citing *Commonwealth v. O'Dell*, 392 Mass. 445, 450–451, 466 N.E.2d 828 (1984)).

that was affirmed on appeal and that the Appellant does not now dispute. Therefore, the voluntariness prong of the inquiry is satisfied, and we thus hold that the Appellant's confession was properly admitted into evidence.

■■■■ Although the defendant's confession cannot be *admitted* into evidence absent a showing of voluntariness, the defendant cannot be *convicted*, once the confession is introduced, without a minimal amount of corroboration. *Smith*, 348 U.S. 147, 152, 75 S.Ct. 194, 99 L.Ed. 192 (citing, *inter alia*, *Warszower v. United States*, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941)). In other words, the defendant cannot be convicted solely on the basis of his voluntary confession. *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000). The rationale for requiring something more than a voluntary confession to convict is that, as one commentator has written, "[s]ince juries are likely to accept confessions uncritically, the demand for corroboration provides a minimal requirement assuring that an untrustworthy confession alone will not lead to conviction." 1 John W. Strong, *McCormick on Evidence* 556 (4th ed.1992) (quoted in *State v. Jones ex rel. County of Maricopa*, 198 Ariz. 18, 6 P.3d 323, 327 (2000)). Therefore, as a supplement to the voluntariness requirement, the corpus delicti ("body of the crime") must be corroborated:

> The rule ... is that while the corpus delicti cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the corpus delicti and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict.

*Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911). Unlike the voluntariness prong discussed above, the corroboration rule "does infringe on the province of the primary finder of facts ... [and] restrict[s] the power of the jury to convict." *Smith*, 348 U.S. at 153, 75 S.Ct. 194. Due Process is violated when the jury convicts on the basis of the defendant's confession absent corroborating evidence of the corpus delicti. *Smith*, 24 S.W.3d at 281.

■■■■ We agree with the appeals court that the corroboration requirement does nothing to aid the Appellant here. Corroboration of the corpus delicti is a "low threshold[,]" *Smith*, 24 S.W.3d at 282; the state needs "only slight evidence ... to corroborate a confession and sustain a conviction." *Id.* at 281. Moreover,

> when there is a written confession [then] the corroborative evidence ... need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession. This evidence is sufficient if of itself it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration. Thus when we have a verdict even though founded on slight evidence of corroboration connecting the defendant with the crime, it cannot be said, as a matter of law, that the verdict is contrary to the evidence.

*Ricketts v. State*, 192 Tenn. 649, 654–55, 241 S.W.2d 604 (1951). Furthermore, corroboration of the corpus delicti may be achieved with circumstantial evidence alone. *State v. Jones*, 15 S.W.3d 880, 891 (Tenn.Crim.App.1999). We also stress that while "[a]ll the elements of the offense must be established by independent evidence or corroborated admissions, ... one available mode of corroboration is for the independent evidence to bolster the con-

fession itself and thereby prove the offense 'through' the statements of the accused." *Smith,* 348 U.S. at 156, 75 S.Ct. 194. In sum, as long as this very modest corroboration requirement is satisfied, the ultimate truth or falsity of the defendant's confession is a determination left to the jury.

██ We think it obvious, as did the Court of Criminal Appeals, that the Appellant's confession was sufficiently corroborated. We need not recite here all the evidence that corroborates the Appellant's confession, but rather will point only to a few examples: Numerous witnesses corroborated the Appellant's account of his meeting with Mathews at the Oak Grove trailer park sometime before the murders. Several witnesses also corroborated the Appellant's statement that Mathews wore a dark, knee-length coat on the night of the murders—a coat stained with the blood of one of the victims. The Appellant's own statement about hearing a loud noise that sounded like a metal door slamming was corroborated by the existence of a metal door at the rear of the Taco Bell restaurant. Witness Jacqueline Dickinson, who saw a white male inside the restaurant wearing clothes similar to those described by the Appellant, corroborated the Appellant's account of Kevin Tween's presence in the Taco Bell at the time of the killings. Perhaps most important, Dickinson also testified that she saw a white car parked in front of the Taco Bell on the night of the killings, which corroborated the Appellant's story that he drove to the crime scene in his white Tracer. Many more examples could be noted. The Appellant's confession was sufficiently corroborated by the evidence.

We hold that the Appellant's confession was properly admitted into evidence for the jury's consideration. Because his statement was made voluntarily, Due Process was not violated by its admission into evidence. Because the statement was sufficiently corroborated, the jury had the requisite basis, along with other proof establishing Housler's guilt beyond a reasonable doubt, for convicting him. Furthermore, the prosecution did not attempt to corroborate known falsities that the confession contained, but rather only those portions that it believed were true. The Appellant's claim denying the veracity of the confession was for the jury to resolve. Myriad procedural mechanisms were available to him at trial to test the statement's truth, including cross-examination of the prosecution's witnesses, the opportunity to present evidence, and the opportunity to testify. We conclude that all the process due the Appellant concerning his "false" confession was provided at trial and that his substantive Due Process rights were not violated on this score.

### B. PRESENTATION OF INCONSISTENT PROSECUTIONS

██ Relying chiefly on *Smith v. Groose,* 205 F.3d 1045 (8th Cir.2000), and a recent decision of the United States Supreme Court in *Bradshaw v. Stumpf,* 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), the Appellant further claims that the State prosecuted Mathews and himself using "inconsistent theories, facts, and arguments" in violation of his Due Process rights. Specifically, he claims the prosecution pursued a "lone perpetrator" theory at Mathews' trial and a "multiple perpetrator theory" at his own trial that, considered together, are "inherently factually inconsistent[,]" cannot be reconciled, and thus are contrary to constitutional protections.

In *State v. Robinson,* No.W2001–01299–CCA–R3–DD, 2003 WL 21946735, at *16 (Tenn.Crim.App. Aug.13, 2003), our Court of Criminal Appeals expressly adopted the

rule of the Court of Appeals for the Eighth Circuit in *Groose*, 205 F.3d at 1052, that such "core" inconsistencies violate Due Process guarantees. But in our review of *Robinson*, we expressly declined to address the issue, or whether the Court of Criminal Appeals erred in adopting the rule, because we held that the facts of the case did not support a finding that the two prosecutions were inherently inconsistent. *State v. Robinson*, 146 S.W.3d 469, 496 n. 13 (Tenn.2004). Just as in *Robinson*, we need not, and do not, address the legal issue here because we conclude that the State did not pursue inconsistent prosecutions at Mathews' and the Appellant's respective trials.

First, we think that the Appellant's "lone perpetrator" characterization of Mathews' prosecution is demonstrably false. During opening statements in Mathews' trial, the prosecution specifically referred to the possible "involvement of people other than Courtney B. Mathews and David Housler" and also mentioned that Housler was "charged[,] as is Courtney B. Mathews[,] in a separate indictment with four counts of first-degree murder." The prosecution further stated that, at that time, it was seeking the death penalty against Housler. The State also claimed "the defendant [Mathews] engaged with others at a party at a trailer in Oak Grove, Kentucky, . . . in a discussion of the planning of [a robbery of] his place of employment." During a sidebar on June 16, the prosecutor mentioned "[t]his case is still under investigation as to other people's involvement." The very last witness called by the prosecutor during rebuttal, Judge Charles Bush, testified that Housler had been indicted for first-degree felony murder and that the State was seeking the death penalty against him. In short, the Appellant's "lone perpetrator" characterization of the Mathews trial seems to be based on the fact that the prosecutor primarily presented evidence only of Mathews' guilt. But since this was the sole issue at his trial, this fact is not remarkable.

We recognize that the prosecution based its case against the Appellant here mainly upon his own confession—a confession that admittedly contained numerous falsehoods that contradict evidence presented at Mathews' trial. The chief variation in the evidence is this: At Mathews' trial, the prosecution presented evidence that Mathews left work at Taco Bell on the night of the killings at about 9:15 p.m., returned to his residence at Ryder Avenue in Clarksville shortly thereafter, packed up several weapons and changed his clothes, and then left alone at around 10:30 to 11:00 p.m.—presumably straight for Taco Bell, where the murders occurred sometime after 2:00 a.m. At Mathews' trial, no account was made of Housler's whereabouts on the evening of the murders; furthermore, the prosecutor presented evidence that Mathews' car was parked outside the restaurant at the time of the killings and that Mathews was seen both inside and possibly outside the restaurant after he clocked out but before it was closed. All this, argues the Appellant, gave the impression that Mathews committed the Taco Bell murders alone. At Housler's trial, the prosecution's evidence, based on the Appellant's confession, showed that on the night of the murders Housler met Mathews and several others at a trailer park in Kentucky, that the group left in two or three cars at about 11:00 p.m., and that they arrived shortly thereafter at the Taco Bell, where Mathews and Kevin Tween entered and within twenty minutes committed the murders and robbery while Housler served as a lookout.

We agree with the Court of Criminal Appeals that the State did not present inconsistent, constitutionally-infirm theo-

ries in the respective prosecutions of Mathews and Housler. Although we do not today adopt the rule of *Groose*, the court there stated that "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases" and that prosecutors need not "present precisely the same evidence and theories in trials for different defendants." 205 F.3d at 1052. The inconsistencies here did not exist at the core of the prosecutors' cases; in fact, the core theory of the two prosecutions was consistent—namely, that Mathews shot the victims and robbed the store, while Housler served as a lookout. These two theories obviously are not irreconcilable. How Mathews and Housler arrived at the Taco Bell on the night of the murders is immaterial to their guilt, and like the appeals court, we do not think there is a "reasonable likelihood" of a different result had the prosecutor presented precisely the same factual evidence—particularly in light of the fact that Housler rebutted the prosecution's case in chief against him by presenting the factual account that the State gave at the Mathews trial.

 Ultimately, the Appellant here argues that the State violated Due Process by presenting differing accounts of both Mathews' and Housler's arrival at the Taco Bell murders—at least one of these accounts, he argues, was certainly not true. We agree that "prosecutors must not present proof of an historical narrative that they know not to be true[,]" *United States v. Siriprechapong*, 181 F.R.D. 416, 422 (N.D.Cal.1998) (summarizing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny), but we also recognize that "prosecutors are not omniscient." *Thompson v. Calderon*, 120 F.3d 1045, 1071 (9th Cir.1997) (Kozin-

ski, J., dissenting). Just as important, prosecutors are not finders of fact.[4] When a prosecutor has conflicting evidence or simply does not know the truth, he "is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment." *Id; see also id.* at 1074–75 (Kleinfeld, J., dissenting) ("The jury is supposed to decide the case based on the evidence and the judge's instruction. . . . It is up to the jury, not the prosecutor, to decide what happened amidst a lot of lies.") In sum, we think the words of Justice Thomas in his *Bradshaw* concurrence apply aptly to this case:

> The Bill of Rights guarantees vigorous adversarial testing of guilt and innocence and conviction only by proof beyond a reasonable doubt. These guarantees are more than sufficient to deter the State from taking inconsistent positions; a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention.

125 S.Ct. at 2410. That is exactly what happened at the Housler trial: the Appellant presented evidence offered at the Mathews trial that contradicted the prosecutors' account of events at his own trial. During his trial, Housler presented evidence to the jury indicating various inconsistencies in the factual accounts. The jury nevertheless chose to convict Housler.

## C. RECANTED TESTIMONY OF LARRY UNDERHILL

 The Appellant next argues that he is entitled to a new trial on the basis of the recanted testimony of Larry Underhill, a prosecution witness. We find no merit in this argument.

---

4. We further answer, as we stated above, that here the prosecutor's narrative of Housler's involvement in the robbery and murders came in through Housler's own confession, and all that was required for its admission into evidence was that it be given voluntarily.

The prosecutor called Underhill for the narrow purpose of eliciting testimony that Housler, while the two were incarcerated in Montgomery County Jail in December 1995, asked about redemption for sin after mentioning that he had "done a terrible thing" by committing the Taco Bell robbery and the murders himself. The prosecutor admitted to the trial judge that he was "not comfortable" with most of what Underhill told him outside of court, but that since other witnesses could corroborate Housler's asking about redemption, he believed that he could present this specific portion of Underhill's testimony to the jury in good faith. After the Appellant's convictions, Underhill recanted his testimony, saying that a chance encounter he claimed to have had later at the Turney Center Prison with Courtney Mathews, who told him that Housler had nothing to do with the crimes, led him to realize that his recollection of the conversation with Housler was a hallucination. He further claimed that he wrote a letter to the prosecutor explaining his recantation; however, the prosecutor said he never received any such letter. Underhill had a history of drug and alcohol abuse, mental health problems, and a lengthy criminal record—all of which were revealed to the jury on cross-examination at Housler's trial.

 A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn.1999).

We hold that the first and third prongs of the *Mixon* test are not satisfied here. First, although the trial judge made no formal findings about the first prong, he presumably found Underhill's recantation not credible, since a new trial was not ordered. We see no reason to disagree with this conclusion, which was also shared by the appeals court. The Appellant presents no evidence to support Underhill's claim that he talked with Mathews after the Housler trial. Moreover, the letter Underhill claimed to have sent to the prosecutor was not received. Concerning *Mixon's* third prong, even were we to conclude that Underhill's recantation is credible, we think it highly doubtful that the trial court would have acquitted Housler on this basis because Underhill's testimony had only minor significance and was also corroborated and cumulative. Housler is not entitled to a new trial on the basis of Underhill's "recantation."

### D. USE OF THE "MATHEWS' TIMELINE"

 Finally, the Appellant claims that a forty-page timeline, composed by Mathews' defense lawyers from statements made by Mathews and numerous potential witnesses, "proves that David Housler is innocent" because Mathews, who refused to testify at Housler's trial, nowhere mentions Housler's participation in the murders and robbery. The timeline was not introduced as an exhibit at trial but was in the possession of defense counsel.

This argument is entirely without merit. The timeline is hearsay composed of hearsay, and much of its information is inconsistent with evidence produced at trial. It is also not internally consistent. The timeline is also not new evidence. And as the appeals court noted, the jurisdiction of both it and this Court is appellate only; we do not have fact-finding authority. Tenn.

Code Ann. § 16–5–108 (1994). Accepting the Appellant's argument would require us to substitute our assessment of the evidence for that of the finder of fact—a task we cannot do. Therefore, we hold that the Appellant is not entitled to any remedy on this ground.

## CONCLUSION

We reject the Appellant's claim that the State violated his Due Process rights by using his "false" confession and advancing inconsistent prosecutions against him and his co-defendant. Therefore, we affirm the Appellant's convictions and sentences.

It appearing that the Appellant David G. Housler, Jr., is indigent, the costs of his appeal are taxed to the State of Tennessee, for which execution may issue if necessary.