# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 5, 2013 Session

## STATE OF TENNESSEE v. JACOB ANDREW BROWN

**Appeal from the Circuit Court for Tipton County**
**No. 6861     Joseph H. Walker, Judge**

---

**No.  W2012-01297-CCA-R3-CD  - Filed August 7, 2013**

---

On January 18, 2011, Ed and Bertha Walker were found beaten to death in their home.  In March 2011, Appellant, Jacob Andrew Brown, was indicted by the Tipton County Grand Jury for two counts of premeditated first degree murder, two counts of felony murder, and two counts of especially aggravated burglary.  Appellant was sixteen at the time the crimes were committed.  The juvenile court held a transfer hearing and determined that Appellant should be tried as an adult in the circuit court.  At the conclusion of a jury trial, Appellant was found guilty of each count.  The trial court merged the two felony murder convictions into the two premeditated first degree murder convictions and merged one especially aggravated burglary charge into the other.  Appellant was sentenced to life without parole for the two murder convictions and eight years to be served at 100% for the especially aggravated burglary conviction.  The trial court ordered that all the sentences were to be served consecutively.  On appeal, Appellant argues that the juvenile court improperly determined that his case should be transferred to the circuit court and that the evidence was insufficient to support his convictions.  After a thorough review of the record, we conclude that Appellant cannot succeed on these issues.  However, because the death of the victim is the serious bodily injury upon which his especially aggravated burglary convictions are based, we remand to the trial court for entry of a judgment reflecting a modified conviction of aggravated burglary and for re-sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed in Part, Modified in Part, and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Gary Antrican, District Public Defender and Davis S. Stockton, Assistant District Public Defender, for the appellant, Jacob Andrew Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Michael Dunavant, District Attorney General, and James Walter Freeland, Jr., for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

In March 2011, the Tipton County Grand Jury indicted Appellant for two counts of premeditated first degree murder, two counts of felony murder, and two counts of especially aggravated burglary. The State filed a petition on January 24, 2011, to transfer Appellant from juvenile court to circuit court. The juvenile court held a hearing on March 3, 2011 and concluded that Appellant should be tried in circuit court. On January 17, 2012, Appellant's jury trial began in circuit court.

On January 18, 2011, Jeremy Walker went to visit his grandparents, Ed and Bertha Walker, who were 80 and 75 years old respectively. He arrived around 2:00 p.m. to get the laundry that his grandmother had washed for him. However, when he arrived, he discovered that the door was locked. This was very unusual. Jeremy told his aunt, Myra Millican, that he had gone by his grandparents' house and the door was locked. Ms. Millican had spoken with Ms. Walker early that morning and again at 11:30 a.m. when the Walkers returned from a doctor's appointment. Ms. Millican called her parents, and they did not answer either their landline or cellphone. At 5:00 p.m., Ms. Millican went to the Walker residence and opened the door with her key. She found her mother on the floor and ran out of the house. A neighbor, Randall Scott Locke, Sr., known as Randy, went into the house and reported that "[s]omebody blew their heads off." The police were called.

William Blake Archer left school early on the date in question. He saw Appellant in the school parking lot when he left between 10:30 and 11:00. Mr. Archer agreed to take Appellant to the Locke house. On the way, they stopped at a "smoke shop" that sold drug paraphernalia as well as tobacco products and "synthetic stuff." Appellant gave Mr. Archer money to purchase two packets of Charge, a substance labeled as "bath salts." Appellant snorted the Charge at the skate park, and Mr. Archer took him to the Locke house.

Anita Hance is a mail carrier. On January 18, 2011, she delivered a certified letter to Randall Scott Locke, Sr. The letter required a signature for delivery. When she got to the Locke house, she found a sixteen- or seventeen-year-old boy in the backyard. He signed for the letter. She said that her interaction with him was "normal."

-2-

Brandon James Wilburn is a cable contractor for Millington Cable. On January 18, 2011, he was at Mr. Smith's house to install internet service. While he was outside, he saw Mr. Walker walk to his mailbox. He saw Mr. Walker speak to someone across the street, but he could not see who it was or hear what he said. Mr. Wilburn saw Appellant at the Locke house and saw him pacing on the front porch and walking around the backyard for thirty minutes. He saw Appellant sitting with his head between his legs and grabbing his head. Mr. Wilburn attempted to speak to Appellant, but Appellant did not answer.

Earlier that day, Gary Smith, a neighbor of the victims, saw the victims when they came home from the doctor's office. He was home because the cable company was installing some wiring for his computer. He saw Appellant in the Locke's backyard. He did not know Appellant's name, but Mr. Smith recognized Appellant because he had seen him at the Locke house on other occasions. Mr. Smith went over in the afternoon to see how the doctor's appointment went for the victims. No one answered the door. Mr. Smith also called their landline and cellphone and no one answered. Around 5:30, he heard Ms. Millican screaming. Mr. Smith ran into the victims' house behind Mr. Locke and saw Mrs. Walker lying in the dining room and Mr. Walker lying in the living room. Mr. Smith said they were very bloody and thought that they had been shot.

At trial, Mr. Smith testified that there had been conflicts between him and the Lockes about their parking in the street and how they needed to rake their leaves. He said that he believed they considered him "nosy."

Special Agent Mark Reynolds with the Tennessee Bureau of Investigation ("TBI") responded to a request by the district attorney's office to help with the murder investigation of the Walkers. When he arrived at the Walker house, he saw Mrs. Walker on the floor in the breakfast area of the kitchen and Mr. Walker in the living room floor. He said Mr. Walker was face down and that the back of his head was "busted open." Agent Reynolds saw a great deal of blood spatter around both of the bodies. He called the TBI's violent crime response team.

As part of his investigation, Agent Reynolds spoke with Mr. Wilburn and Ms. Hance. They told him about the young man at the Locke house. Agent Reynolds checked the school records and discovered that Appellant had left school early that day. Appellant's teachers told Agent Reynolds that Appellant was good friends with Randall Scott Locke, Jr., known as Scott.

Scott Locke testified that he had been friends with Appellant for four years. A few times he had complained about his "nosy neighbor" to Appellant, and Appellant said, "Let's go kill them." Scott assumed that this was a joke. Appellant had spent the night with Scott

the night before the day in question. Scott had taken Appellant to school. Appellant sent Scott a text message informing Scott that he had found a ride from school. Appellant sent Scott a text message later that said, "You wanted your nosy neighbors dead, right?" Scott did not respond.

Scott came home from school at 2:45. He found Appellant walking around his backyard. Scott testified that Appellant was acting normally. They ran errands with Scott's mother and returned to the house. At some point that afternoon, Appellant told Scott that he had killed the Walkers. Scott did not believe him. Appellant showed Scott the baseball bat which had several "very heavy dents" in it, but he still did not believe him.

After Scott's father, Randy, came home, they heard a horrible scream outside. The Walkers' relatives were standing in the street screaming. Randy ran to the Walker house, and when he returned, he said they were dead. Randy told Scott, Appellant and Appellant's brother, Lucas, that they needed to leave with their friend, Zach Douglass. They went to a friend's house and smoked marijuana and played video games. Appellant's mother picked them up and drove them to the Admiralty Inn in Millington. The following day, Randy Locke informed Agent Reynolds that he had rented a motel room for Appellant, Lucas, and Scott.

Agent Reynolds, along with other law enforcement officers went to the hotel. They found the three teenagers and Zach Douglass in one room, and Appellant's mother in an adjoining room. While in the hotel rooms, the officers saw a pair of shoes that appeared to have blood on them. Appellant told the officers that the shoes were his. The officers also took a pair of blue jeans that had a prescription for Appellant in the pocket.

The occupants of the hotel rooms were taken to the Munford Police Department and interviewed. Agent Reynolds and Munford Police Captain Randall Baskin interviewed Appellant. Appellant waived his *Miranda* rights prior to the interview. Initially, Appellant denied any involvement with the victims. Shortly after the Appellant's initial statement, Agent Reynolds received a phone call informing him that Appellant's shoes, blue jeans and jacket from the motel room tested positive for blood.

When Agent Reynolds told Appellant that the forensics team would be collecting evidence connecting him to the murders, he noticed a shift in Appellant's demeanor. He gave the following statement to Agent Reynolds:

I left school between 12:30 p.m. and 1:00 p.m. I walked around the neighborhood near the ball fields. I walked through the graveyard and to the

-4-

skate board park. I walked to Scott Locke's house on Wiley. I don't really recall what time I got there. I sat at Scott's house and played with the dogs and walked around his porch. The house was locked, and I wasn't able to get in.

The mailman came up, and I signed for a package for Mr. Randy. I put the package on the porch on the ledge. It wasn't a package. It was just mail you had to sign for.

A little bit after I signed for the mail I walked over to the Walkers. I went over to ask to use the restroom. I knocked on the door, and Mr. Walker came to the door. I asked him if I could use his restroom. He let me in and asked me if I was locked out of the house. I told him I was, and he said to come on in, and he pointed to the direction of the restroom. I went and used the restroom. I came out of the restroom and went to the living room and talked to Mr. Walker. I told him he had a nice house. He was sitting in a chair. I was standing.

All of a sudden I became very angry. I don't think he said anything that would cause me to get angry. I said thanks and left. We did not argue or he did not know I was angry. I walked across to Scott's and got an aluminum baseball bat. I walked back over to the Walkers with the bat. I put the bat behind me under my coat. I was hiding it.

I walked back and knocked again, and Mr. Walker came to the door again. I don't recall saying anything. He opened the door. There is probably more, but I don't remember. Some of the things are blank to me. I went to the front door on the porch, not the door at the driveway. We were both standing in the living room. I did not say anything to him. I just pulled the bat from behind my back, swung and hit him in the forehead in the front. He did not fall, so I kept hitting him. He eventually fell face down.

His wife was screaming and came into the room. I pushed her, and she fell into the dining room. She was on the ground and I started swinging and hitting her. I really don't know where I was hitting her. I don't know how many times I hit her or Mr. Walker. I didn't stop until they were not moving anymore.

I then left out the same door I came in. I think I locked the door behind me, but I really can't remember. I walked back over to Scott's and threw the bat beside the house in some trash. I just sat down on a basket thing in the

-5-

back yard and didn't move. I sat there until Scott came home. After I put the bat down and before I sat down, I washed my hands in a puddle of water in the back yard. I think I also washed my face with the water in the puddle. When Scott came home, his mom and sister were in the truck with him.

The story picks up and is exactly like I told you in the first statement from this point. As I sat in the back yard I was still angry and confused. I just couldn't stop. I didn't say anything while I was hitting them.

Officers located the baseball bat in the location that Appellant described. The bat was shown to Appellant, and he identified it as the murder weapon. A DNA sample was taken from Appellant.

TBI Special Agent David Harmon was with the violent crime response team involved with the investigation of the murder of the victims. He collected items from the hotel room including several pairs of shoes and Appellant's cellphone. TBI Special Agent John Sullivan collected blood samples from the victims. Special Agent Joel Franklin Wade is a forensics specialist in computers and mobile phones. He found a text message from Appellant to Scott stating, "Yo, dude, I got a ride, oh yeah, and you said you wanted your nosy neighbors dead, right?"

TBI Special Agent Laurence James with the violent crime response team processed the victim's house. He made note of the position of the victims' bodies and the blood spatter present at the scene. He concluded that Mrs. Walker had been moved after the beating. Agent James based this conclusion on blood spatter on a piece of furniture, a pool of blood a fair distance from the body, and a transfer bloodstain on her ankle. Agent James opined that the blood spatter surrounding Mr. Walker indicated the brutality of the attack. He said that he found blood spatter with hair attached in the hallway that was thirteen feet away from the body. He also collected blood samples for DNA analysis from the victims.

Agent James testified that the blood on Mrs. Walker was tested, and it contained a mixture of DNA from both her and Mr. Walker. The blue jeans, shoes, and jacket collected at the hotel tested positive for the presence of blood. The blood from these items were compared to the DNA samples from the victims and Appellant. The blue jeans contained a mixture of DNA matching both victims and a third unidentified person. The shoes contained a mixture of DNA matching both of the victims. On the jacket, the DNA found belonged mostly to Mrs. Walker, but Mr. Walker's DNA was also found as a minor contributor. Agent James testified that the blood stains on the jacket were "consistent with a baseball bat

swinging backwards and depositing blood on the rear shoulder area." The baseball bat contained DNA matching Mrs. Walker.

Dr. Karen Chancellor is the Chief Medical Examiner for Shelby County. She performed the autopsies on the two victims. She testified that the cause of death for Mr. Walker was blunt force injuries. She stated that he suffered at least fifteen blows to the head and that any one of them could have been fatal. Dr. Chancellor also concluded that blunt force injury was the cause of Mrs. Walker's death. Dr. Chancellor stated that Mrs. Walker sustained at least sixteen blows to her head, as well as additional blows to her body. She stated that "one of the large lacerations on her head would result in enough bleeding that could cause death."

The jury returned a verdict convicting Appellant on all six counts on January 19, 2012. After additional proof, the jury determined that Appellant should be sentenced to life without parole for the murder convictions. On April 3, 2012, the trial court held a sentencing hearing and sentenced Appellant to eight years at 100% for the especially aggravated burglary conviction. In addition, the trial court merged the two felony murder counts into the premeditated first degree counts and one especially aggravated burglary count into the other. The trial court ordered that all the sentences were to be served consecutively.

Appellant filed a timely notice of appeal.

## ANALYSIS

### Transfer to Circuit Court

Appellant argues that the juvenile court erred in transferring his case to circuit court. He argues that: the juvenile court erred in its "process of assessing committability"; the juvenile court's denial of funding for an independent psychological evaluation precluded a fair and impartial determination regarding committability; the juvenile court erred in holding Appellant without bond; and the decision to transfer Appellant failed to follow the minimum requirements set out in Tennessee Code Annotated section 37-1-128 and the process was inherently flawed.

A juvenile court may transfer a child, who is sixteen at the time the alleged crime was committed, to the criminal court to be tried as an adult if the child is alleged delinquent and charged with one of several listed crimes, including first degree murder. T.C.A. § 37-1-134(a)(1). Before such transfer can occur, the juvenile must be provided with notice and a hearing on the transfer. T.C.A. § 37-1-134(a)(2), (3). During the hearing, the juvenile court must find "reasonable grounds to believe" that the juvenile committed the delinquent act as

alleged, that the juvenile "is not committable to an institution for the developmentally disabled or mentally ill," and that the community's interests require legal restraint or discipline of the juvenile. T.C.A. § 37-1-134(a)(4)(A)-(C). In considering whether to transfer the juvenile to criminal court, the juvenile court shall consider the following factors:

(1) [t]he extent and nature of the child's prior delinquency records;

(2) [t]he nature of past treatment efforts and the nature of the child's response thereto;

(3) [w]hether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) [w]hether the offense was committed in an aggressive and premeditated manner;

(5) [t]he possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) [w]hether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

T.C.A. § 37-1-134(b)(1)-(6).

On appeal of an order of transfer from juvenile court, we do not decide where the preponderance of the evidence lies, but whether there were reasonable grounds for the juvenile court judge to believe that the three criteria of section 37-1-134(a)(4)(A)-(C) mentioned above were present. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975); *State v. Layne*, 546 S.W.2d 220, 224 (Tenn. Ct. App. 1976). A juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal, if there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the juvenile was not mentally impaired and should be legally restrained. *See State v. Mario A. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6 (Tenn. Crim. App., at Nashville, Aug. 31, 2010), *perm. app. denied*, (Tenn. Jan. 13, 2011); *State v. Cecil L. Groomes, et al*, No. M1998-00122-CCA-R3-CD, 2000 WL 1133542, at *7 (Tenn. Crim. App., at Nashville, Aug.10, 2000) (citing *State v. Orange*, 543 S.W.2d 344, 346-47 (Tenn. Ct. App. 1976)).

On March 3, 2011, the juvenile court held a transfer hearing to determine if Appellant's case should be transferred to circuit court. Agent Reynolds and Scott Locke were the first two witnesses. They testified about the facts and the investigation relating to the murders of the victims. Their testimony essentially laid out the same facts as related above.

The next witness was Dr. Wyatt Nichols with West Tennessee Forensic Services. Dr. Nichols is a clinical psychologist specializing in forensic psychology. The juvenile court requested that Dr. Nichols evaluate Appellant for purposes of the transfer hearing. Dr. Nichols stated that the trial court's request was for him to determine the following:

> [W]hether the child has a mental illness or mental retardation; whether the child is subject to voluntary admission or involuntary commitment; the type of care, training, and treatment required to address any mental illness or mental retardation found; any resources available to provide such services, included but not limited to those provided by Tennessee Department of Children's Services; and the specific forensic issue, competency to proceed.

Dr. Nichols testified that he reviewed records from Lakeside Hospital where Appellant had in-patient treatment in September 2010. He reviewed records from out-patient treatment that happened after Appellant's discharge from Lakeside. Dr. Nichols further reviewed notes from Appellant's therapist, by whom he was treated when he was ten years old. Dr. Nichols discussed Appellant's treatment at Lakeside with Appellant's psychiatrist, Dr. Hoehn. Dr. Nichols stated that Appellant was tested for the doctor's evaluation and he was interviewed for about three hours over a two day period. Dr. Nichols submitted his report to the juvenile court.

Dr. Nichols concluded that Appellant was competent to proceed to trial and that he was not mentally retarded. He stated that Appellant was of at least average intelligence. Dr. Nichols stated that Appellant could benefit from hospitalization but that it was not absolutely necessary. Dr. Nichols testified that Appellant did have a mental illness, and Dr. Nichols was of the opinion that Appellant was developing schizophrenia. He said Appellant had the early symptoms of paranoid schizophrenia.

The juvenile court held the following at the conclusion of the hearing:

> The evidence today has shown that the child is 16 years or more of age and that he is charged with an offense that allows the State to petition the Court for

transfer, that being first-degree murder, and there are other offenses delineated in the statute. Only the most serious crimes allow the State to make this request of the Juvenile Court.

Once the request is made, of course, there are various elements that the Court has to look at, but particularly that the child is 16 years or more of age at the time of the alleged conduct, that he is charged with a transferable offense.

And then at the hearing the Court is to follow certain rules as set out by State law, which the Court has followed. Reasonable notice was given to the parents as required by statute.

And then the Court is required to look at three grounds; that is, whether or not there are reasonable grounds to believe that the child committed the delinquent act that he is alleged to have committed, which the Court finds certainly the State has shown reasonable grounds.

The second test is whether or not he is committable to an institution for the mentally ill. And, [defense counsel], certainly [Appellant] has significant mental issues. I'm not finding guilt or innocence. I just deal with a probable cause, reasonable grounds issue today. But the Court will believe that anyone that is charged with committing a double murder with a baseball bat certainly has significant mental issues. No one that is normal would commit such an act.

But that's not the test that the Court is required to look at. The test is whether or not he is committable into a mental institution. And some General Sessions judges do a lot of commitments with adults. This Court in this particular county doesn't have that jurisdiction. But I do have the jurisdiction to commit juveniles, and I've had some of these.

And the question would be if the State tried to involuntarily commit [Appellant] and he fought it and his parents fought it, would -- it would take the testimony of two doctors to testify that he is dangerous to himself or others and ask for a Court Order forcing him against his will to be placed into a mental health institution. And I think Dr. Nichols was clear in his testimony, he did not rise to that level.

-10-

Now, the Court had the evaluation done. It's about three weeks, maybe 30 days old or whatever. And I don't think that the law requires someone to continue to be tested right up to the day that they come to court.

The Court has -- we have exercised considerable resources in having this evaluation done, and Dr. Nichols indicated, yes, [Appellant] does have significant problems. But the Court does not believe it rises to the level where he could be involuntarily committed into a mental institution because he is mentally ill, which is what the test is.

The juvenile court concluded that all requirements were met to transfer Appellant to the custody of the circuit court.

## Committability

Appellant first argues that the juvenile court erred because it used the wrong analytical process to determine whether or not Appellant was "committable." In his brief, Appellant argues that the juvenile court "confuse[d] the legal obligations regarding burden of proof and the Court appears to have placed no burden at all upon the State to affirmatively prove that the appellant was noncommittable to a psychiatric hospital." The State disagrees.

As set out above, three witnesses testified at the transfer hearing, Agent Reynolds, Scott Locke, and Dr. Nichols. Dr. Nichols testified extensively about his review of Appellant's records, Appellant's testing in his office, and his interview of Appellant. Dr. Nichols stated that while Appellant was mentally ill he was not committable to a psychiatric institution. At the conclusion of the hearing, the juvenile court went through all the statutory factors. Although the juvenile judge mentioned the use of two doctors in an involuntary commitment hearing and various requirements in an adult commitment hearing, the juvenile court clearly stated that the test to be applied in Appellant's case was "whether or not he is committable into a mental institution."

We conclude that the juvenile court neither applied an incorrect analysis nor shifted the burden of proof. Dr. Nichols testimony regarding his evaluation of Appellant. This testimony was reasonable grounds upon which the juvenile court could rely to find that the second criteria for transfer was met, namely, that Appellant was not committable. After a review of the record, we conclude that there was probable cause to support the juvenile court's decision.

## Funding

Appellant also argues that the juvenile court's denial of funding for the procurement of his own psychological evaluation predetermined that he would be transferred and this violated his right to due process and effective assistance of counsel.

Appellant filed an ex parte motion requesting funds to hire a forensic criminal psychologist to conduct a mental health evaluation. The juvenile court denied the motion in a written order that stated the following, in part, "The Court previously ordered it's own independent psychiatric evaluation of the Defendant which has been completed and filed with the Court. The Court finds that at the stage of proceedings presently before the Court, a Transfer Hearing, that the independent psychological evaluation already conducted by the Court is sufficient for the issues to be decided."

Appellant puts forth a confusing argument that Dr. Nichols stated that Appellant was not committable because he was incarcerated. The following exchange occurred during the cross-examination of Dr. Nichols which is pertinent to this issue on appeal:

> Q. And your report says he's not committable because he's, I think you used the word incarcerated?
> A. Well, I didn't mean to word it that way, if I did. As long as he is incarcerated he is not committable at this time.
> Basically there are two reasons a person would be committable in [Appellant's] situation. One would be they would be so psychotic that they couldn't control themselves and there was a management problem for the jail or they may hurt themselves due to their psychosis or somebody else would hurt them, or they're suicidal or homicidal. He's neither to that point.

Dr. Nichols clarified later in his testimony that Appellant was not committable whether he was incarcerated or not. He specifically stated, "he would not be committable if he were out of jail." Therefore, Appellant's argument regarding this line of testimony is meritless.

Appellant also argues that his right to due process was violated because the denial of his request for funding for a psychological examination prevented him from confronting and effectively cross-examining witnesses. Appellant cites to no authority that specifically states that funding for a psychiatric evaluation for the defense is required under either the United States or Tennessee Constitutions. Appellant relies upon the Advisory Commission Comments to Rule 24 of the Tennessee Rules of Juvenile Procedure which states:

Regarding § 37-1-134, and subsection (b)(4) of Rule 24, it has been held by both the Tennessee Court of Appeals and Court of Criminal Appeals that, although the burden of proof is on the prosecution on such issue, there is a presumption of non-committability similar to that relating to sanity in criminal trials. Such presumption can be rebutted by evidence introduced by the defendant, and in such event the burden would shift back to the prosecution to persuade the court the child is not committable. *See Boyd v. State*, Tenn. Crim. App. (December 30, 1979); *State v. Miller*, Tenn. App., Middle Section (June 25, 1976). *The committee suggests, however, that it is good practice in any case for the court to arrange for testing and evaluation, evidence of which may be introduced by either side of the parties or the court on the issue of committability.*

(emphasis added).

Although Appellant cites this comment to support his argument, it actually does the opposite. The Advisory Commission suggests that the best practice is for the court to order testing and evaluation. In the case at hand, the juvenile court followed this suggestion. On January 24, 2011, the juvenile court ordered an outpatient evaluation of Appellant by West Tennessee Forensic Services. Furthermore, the juvenile court did not restrict Appellant's cross-examination of Dr. Nichols. Because the juvenile court acted precisely as directed in the Advisory Commission Comments to Rule 24 and was allowed to fully cross-examine Dr. Nichols, we conclude Appellant's due process rights were not violated.

Appellant also argues that he was afforded ineffective assistance of counsel based upon this issue. Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the defendant bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

Appellant relies upon *Howell v. State*, 185 S.W.3d 319 (Tenn. 2006) to support his argument. In *Howell*, our supreme court held that trial counsel's representation of the defendant was deficient because trial counsel failed to offer evidence at the defendant's juvenile transfer hearing concerning his mental health. 185 S.W.3d at 327. The supreme court based this decision on the fact that trial counsel's statement that he was waiting until the criminal trial to present mental health evidence was not supported by the record and trial counsel did not adequately prepare and investigate even if the record had supported his strategy. Appellant argues that this supports the conclusion that the failure of defense counsel to secure a mental evaluation is de facto deficient representation.

However, the facts in the case at hand are very different. In this case, trial counsel filed a motion requesting funding to pay for his own evaluation of Appellant's mental health. The trial court denied the motion. We cannot find any fault on the part of trial counsel. He filed a motion which was denied by the trial court. There was no deficiency in counsel's representation of Appellant in this regard. Therefore, Appellant cannot meet both prongs of the test set out in *Strickland v. Washington*, 466 U.S. 668, 694 (1984), and he cannot prevail.

Therefore, this issue is without merit.

Bond

Appellant also argues that the juvenile court erred when it failed to set bond when the case was transferred from juvenile court. The State concedes that the juvenile court erred when it did not set bond. However, the State also argues that the error was harmless.

At the conclusion of the transfer hearing, the juvenile court stated that it could not set bond because Appellant's case was a capital case and that the juvenile court lost jurisdiction upon transfer. Under Rule 24(b)(7) of the Tennessee Rules of Juvenile Procedure, the juvenile court must set bond in the order of transfer so long as the offense is bailable. Tennessee Code Annotated section 40-11-102 states that "[b]efore trial, all defendants shall be bailable by sufficient sureties, except for capital offenses where the proof is evident or the presumption great." Appellant was a juvenile when he committed the crime, therefore, the death penalty was not applicable to his case. T.C.A. § 37-1-134(a)(1).

Pursuant to the rules and statutes in this State, the juvenile court should have set bond at the conclusion of the transfer hearing. The proper remedy for a juvenile to pursue when bail is denied upon transfer is to appeal to the circuit court. T.C.A. § 40-11-144(b). In this case, Appellant did so when he filed a motion to set bond on April 1, 2011, and the circuit court set bond at $750,000.

We agree with Appellant that the juvenile court erred, but we also agree with the State that, in view of the eventual setting of bond, the error was harmless. The circuit court set bail upon receiving Appellant's case. In addition we note that a court's failure to grant a defendant bond does not necessarily lead to dismissal of the indictment. *State v. Johnson*, 980 S.W.2d 414, 421 (Tenn. Crim. App. 1998).

Therefore, Appellant is not entitled to relief on this issue.

## Tennessee Code Annotated section 37-1-128 Requirements

Appellant also argues that the juvenile court did not follow the requirements of Tennessee Code Annotated section 37-1-128 because there was no report from the Department of Children's Service ("DCS"). The State argues that Appellant failed to object to the fact that there was no DCS report and cannot now claim error.

Appellant does not cite any authority that states that a report from DCS is mandatory before transfer. Tennessee Code Annotated section 37-1-128(c)(1) addresses the adjudication of a child as delinquent, unruly, or dependent and neglected. That statute states, in part, "the court *may* order that the department make an assessment of the child and report the findings and recommendations to the court." T.C.A. § 37-1-128(c)(1) (emphasis added).

Furthermore, there is no evidence in the record that Appellant lodged any objection to the fact that there was no DCS report before or during the transfer hearing. Typically, a defendant's failure to make a contemporaneous objection during trial constitutes a waiver of an issue. Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a) (stating that "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Cravens*, 764 S.W.2d 754, 757 (Tenn. 1989). After a review of the record, we agree with the State. Appellant made no objection to fact that there was no DCS report. Therefore, he cannot successfully raise this issue on appeal.

## **Sufficiency of the Evidence**

Appellant argues that the evidence was not sufficient to support his convictions of first degree premeditated murder, first degree murder or especially aggravated burglary because Appellant had a "clearly psychotic and impaired mind." The State argues that the evidence was sufficient to support the convictions.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled

principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *see Tuggle*, 639 S.W.2d at 914.

Appellant's argument on appeal consists of an assertion that Appellant "was psychotic months before this event took place" and a recitation of the facts presented at trial, with no citations to the record. He also argues that there are no available studies as to the effects of "bath salts" to explain Appellant's actions as a reaction to the drug used the afternoon of the murders.

Appellant was allowed to present his own witnesses and present proof as to his mental condition at trial. Dr. Fred Steinberg testified regarding his training as a forensic and clinical psychologist and his practice. He completed an evaluation of Appellant and testified at trial about his findings. The jury heard the evidence presented and found in favor of the State. As stated above, it is not this Court's role to resolve witness credibility and resolve questions of fact. *Pruett*, 788 S.W.2d at 561.

Furthermore, in the case at hand, Appellant confessed to the crimes. Our supreme court has stated that "the state needs 'only slight evidence . . . to corroborate a confession and sustain a conviction.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn.2006) (quoting *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000)). In addition, circumstantial evidence is sufficient to corroborate such a statement. *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999).

There was ample evidence to corroborate Appellant's statement. Mr. Archer stated that he dropped Appellant off at the Locke house on the day in question. Appellant was seen walking into the Walker house by Mr. Wilburn, the cableman. Ms. Hance, the postal carrier also placed Appellant at the Locke house across the street from the Walker house. DNA from the victims was discovered on Appellant's shoes, blue jeans, and jacket. The position of the bodies matched the description given by Appellant to the police. Appellant said he used a baseball bat which was located by police. The bat had several large dents in it and the medical examiner testified that the victims died from blunt force injury to the head.

We conclude that there was sufficient evidence to support the conviction of Appellant for all charges.

## Modification

The State states in its brief that Appellant's convictions for first degree murder and especially aggravated burglary cannot stand where the serious bodily injury suffered by the victims is death.

Tennessee Code Annotated section 39-14-404 sets out the offense of especially aggravated burglary, which is the burglary of a habitation where the victim suffers serious bodily injury. The statute provides, "Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). This Court has held that a conviction for both especially aggravated burglary and murder cannot stand because the killing of another is "serious bodily injury" under this statute. *See State v. Oller*, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). When such an

-17-

event has occurred, the "proper remedy" is to modify the sentence for especially aggravated burglary to aggravated burglary as a lesser included offense. *See State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); *Oller*, 851 S.W.2d at 843.

Therefore, we remand to the trial court for entry of a judgment reflecting a modified conviction of aggravated burglary and for re-sentencing.

## CONCLUSION

For the foregoing reasons, we affirm the transfer from the juvenile court to the circuit court and Appellant's convictions for murder. However, we remand to the trial court for entry of a judgment reflecting a modified conviction of aggravated burglary and for re-sentencing.

_____
JERRY L. SMITH, JUDGE