# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 18, 2013 Session

## STATE OF TENNESSEE v. HOWARD BRACKSON CARRIER

**Appeal from the Criminal Court for Sullivan County**
**No. S56158      R. Jerry Beck, Judge**

---

**No. E2013-00247-CCA-R3-CD - Filed April 23, 2014**

---

A Sullivan County jury convicted appellant, Howard Brackson Carrier, of first degree premeditated murder, felony murder committed during the perpetration of a burglary, attempted first degree murder, and aggravated burglary, for which he received a sentence of life for the merged murder convictions, fifteen years, and three years, respectively. After the trial but before the hearing on the motion for a new trial, defense counsel discovered new evidence indicating that one of the State's witnesses had falsely testified that a knife sharpener found at the murder scene belonged to appellant. At the motion for a new trial hearing, appellant argued that the testimony was crucial because it formed the basis for premeditation and intent. The trial court denied the motion, and this appeal follows. Herein, appellant raises one issue for our review: whether the witness's false testimony necessitates a new trial. Following our review, we affirm the judgments for attempted first degree murder and aggravated burglary. We affirm the convictions for first degree premeditated murder and felony murder but vacate the judgments and remand the case to the trial court for entry of a single judgment for first degree murder noting merger of the two convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part, Vacated in Part; Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee, for the appellant, Howard Brackson Carrier.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Barry Staubus, District Attorney General; and Joseph Eugene Perrin and Julie Canter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case involves the December 10, 2008 murder of Jeffrey Washburn, the attempted murder of Brenda Carrier, and the aggravated burglary of her residence. Because appellant presents only one issue for our review, our recitation of the facts will be limited to those necessary to provide a contextual background and to those pertinent to a determination of this issue.

### I. Facts

Brenda Carrier testified that she was married to appellant and that they had two children born of the marriage. One of their sons was an adult and lived in his own house, while the younger son remained in the family home with appellant. In October 2007, Ms. Carrier left the marital home and told appellant that she "was leaving and [she] wasn't coming back." In March 2008, she moved into a second-floor garage apartment owned and furnished by her employer. In October 2008, Ms. Carrier emphasized to appellant that "it was over, and [she] couldn't do it anymore." When he questioned her about whether her decision involved another man, she explained "that it wasn't because of a man, it was because [she] was done. [She] was done with him never being there."

Shortly thereafter, Ms. Carrier met Jeffrey Washburn. In November, she advised appellant that she had been talking with another man. On the night of December 9, 2008, Ms. Carrier spoke with appellant around 5:00 p.m. to ensure that appellant would be at home with their younger son. He responded that he would be at home. Subsequently, Mr. Washburn drove Ms. Carrier to his home, where they spent the night. When Ms. Carrier left her apartment, she locked the door and turned on the porch light.

Ms. Carrier returned to her home around 5:30 a.m. on December 10. When she arrived, she first noticed that her porch light was off. Mr. Washburn and Ms. Carrier ascended the stairs, and when they reached the landing, they observed that the glass in the door was broken. Ms. Carrier suggested that they retreat and call the police, but as they turned to leave, appellant emerged from Ms. Carrier's apartment and addressed Mr. Washburn, asking, "'Are you the man that's f****** my wife?'" Mr. Washburn responded, "'We don't need to do this. I need to go to work.'" Mr. Washburn then raised his hands and asked appellant, "'What's that in your hand?'" Ms. Carrier began to scream. She tried several times to call 9-1-1 from her cellular telephone, but she did not think the call ever connected. Mr. Washburn and appellant began wrestling on the porch. Mr. Washburn was on top of appellant, and appellant was stabbing Mr. Washburn in the back. Ms. Carrier knew that appellant was a hunter and owned several knives. Ms. Carrier ran over to the tussle and removed the knife from Mr. Washburn's back. She threw the knife, which she described as

"pretty big," off the porch. Appellant then stood up and pushed Mr. Washburn onto the floor of the porch.

Appellant next threatened Ms. Carrier, saying that he was going to kill her. He took Ms. Carrier into her apartment, where he displayed a pocket knife. He forced her to the ground and stabbed her in the breast, in the chest, and in the face. Ms. Carrier believed she was going to die. Patsy Kendrick, Ms. Carrier's neighbor, then entered the apartment and told appellant to stop. She assisted Ms. Carrier to her home. An ambulance arrived and escorted Ms. Carrier to the hospital, where she remained for six days.

In the early morning hours of December 10, 2008, Patsy Kendrick heard Ms. Carrier screaming out, "Howard!" She ran toward Ms. Carrier's garage apartment as she called out for someone in her home to dial 9-1-1. Upon arriving, Ms. Kendrick saw that the glass in the door was broken, and she saw appellant standing over Ms. Carrier with a knife. Ms. Carrier was lying on the floor, and her mouth was full of blood. Appellant appeared calm and emotionless. After Ms. Kendrick instructed appellant to leave the apartment, he stabbed himself. Ms. Kendrick grabbed Ms. Carrier's hand, pulled her through the door, and assisted her down the stairs. They proceeded to Ms. Kendrick's home, and as she looked back, Ms. Kendrick noticed appellant calmly walking down the stairs. Ms. Kendrick attempted to render aid while they waited for emergency medical personnel to arrive.

While Ms. Carrier's personal items were being removed from the apartment, a knife sheath and a knife sharpener were found in the apartment, but they did not belong to her. She had never seen the items during the time she lived in the apartment.

Cordell Carrier,[1] the older son of Ms. Carrier and appellant, testified that appellant suspected Ms. Carrier of seeing another man while they were separated. Appellant told him that "if he caught her with another man[,] he would kill him." In late November 2008, Cordell was eating lunch with appellant in appellant's truck. He noticed a large hunting knife lodged in the seat of the truck and asked appellant why he had it. Appellant answered, "[I]n case [I] needed to kill someone."

Appellant went to Cordell's home sometime after midnight on December 10, 2008, and wanted to borrow a pipe with which he could smoke crack cocaine. Appellant left then returned between 2:00 and 3:00 a.m. He again left Cordell's home. Appellant telephoned Cordell around 5:45 or 5:50 a.m. and informed Cordell that he had killed Ms. Carrier and the

---

[1] Appellant and his son, Cordell Carrier, share the same surname. To avoid confusion, we will refer to Cordell Carrier as "Cordell" and to Howard Carrier as "appellant." In addressing Cordell Carrier by his first name, we intend no disrespect.

man she had been seeing and that he had stabbed himself. Cordell knew appellant to be a hunter and to possess hunting knives, sheaths, and knife sharpeners. At trial, he identified a knife sheath and a knife sharpener that were found in Ms. Carrier's apartment as belonging to appellant.

Ms. Carrier's sister, Joyce Ann Hall, accompanied Ms. Carrier and others to the apartment to collect her personal belongings approximately one week after she was released from the hospital. As they were packing, Ms. Hall found a knife sharpener and a sheath and removed them from the apartment so as not to upset Ms. Carrier. Approximately three months later, Cordell asked Ms. Hall for the items, and he subsequently turned them in to a detective.

Appellant testified that in early 2008, Ms. Carrier began to stay at the garage apartment on Tuesday nights only because she worked late and received several telephone calls late into the night on those occasions. In October 2008, Ms. Carrier began staying at the apartment every night.

Appellant "sensed a change" in Ms. Carrier and attempted to take her out to dinner and buy her flowers more frequently. Ms. Carrier "started disappearing" and would be unreachable on her cellular telephone. When he questioned her whereabouts, she would respond that "it was none of [his] business." Appellant asked Ms. Carrier if she was seeing someone else, and she denied that she was.

Appellant telephoned Ms. Carrier at 12:22 a.m. on December 10, 2008, but she did not answer. He again called her at 4:56 a.m., and she indicated that she was at her home. Appellant purchased breakfast at a drive-thru restaurant and drove to Ms. Carrier's home. After knocking several times and receiving no response, he became concerned that something was wrong, so he kicked in the door. He entered the apartment and looked around to ensure that she was not in distress. At that time, he had in his possession a pocketknife, which he always carried, and his uncle's knife, which he regularly carried "as a memento to [his] uncle" who had passed away. He denied that the knife sharpener found in Ms. Carrier's apartment belonged to him.

Upon completing his search, he started to exit the apartment but encountered Ms. Carrier and Mr. Washburn at the door. He asked what was going on, and Mr. Washburn responded that he did not have time for an encounter because he had to go to work. Appellant asked, "'Have you been f****** my wife?'" Mr. Washburn responded, "'Every chance [I] [get].'" The two men then began fighting. Appellant said that he "blacked out" and did not recall stabbing Mr. Washburn. The next thing he remembered was Ms. Carrier's neighbor shouting for him to leave the apartment. At some point, he stabbed himself in the chest four

times, but he did not recall whether he did so in Ms. Carrier's apartment or after he left. When he arrived home, he cut both of his wrists and attempted to cut his jugular vein by stabbing himself in the neck. Subsequently, the SWAT team entered appellant's home, and an ambulance transported him to the hospital, where he was released one to two days later and placed in custody.

In rebuttal, Lieutenant Jerry Smelser and Officer Michael Still testified that appellant made statements while at the hospital indicating that he had stabbed Mr. Washburn and Ms. Carrier and that he thought he had killed them both.

After deliberating, the jury found appellant guilty of first degree premeditated murder, felony murder committed during the perpetration of a burglary, attempted first degree murder, and aggravated burglary. Following a sentencing hearing, the trial court merged the murder convictions and sentenced appellant to life for the merged conviction; fifteen years for attempted first degree murder; and three years for aggravated burglary.

At the motion for a new trial, appellant presented evidence that the knife sharpener found at Ms. Carrier's apartment belonged to the owner of the apartment and not appellant, as was mistakenly asserted at trial by Cordell Carrier. The State stipulated to the admission of affidavits from Cordell and the property owner. Cordell recanted his trial testimony with regard to the knife sharpener, and the property owner affirmed that the knife sharpener belonged to him. Appellant contends that false testimony concerning his bringing the knife sharpener to the crime scene with him was pivotal in establishing premeditation and intent for felony murder. The State stipulated the truth of the facts, as well as the fact that defense counsel did not have an opportunity to interview Cordell because he declined to speak with counsel prior to trial. However, the State argued that the false testimony did not affect the jury's verdict of guilty on the charge of premeditated murder and that even if premeditation were negated, the false testimony would not have impacted the guilty verdicts for felony murder or aggravated burglary whatsoever.

The trial court reviewed the evidence and found that the evidence of guilt was overwhelming. Accordingly, the trial court denied appellant's motion for a new trial. This appeal follows.

## II. Analysis

The sole question presented in this appeal is whether appellant is entitled to a new trial because his right to a fair trial was violated by the testimony of a State's witness who mistakenly identified a knife sharpener found at the murder scene as belonging to appellant.

He asserts that he has never denied killing Mr. Washburn or stabbing Ms. Carrier; rather, he contends that his actions were the result of provocation and not premeditation or intent.

In this case, all parties agree that the State did not intentionally present false testimony to the jury. As such, we review this issue under the standard for *recanted* testimony. In conducting such a review, we are mindful that a trial court should grant a motion for a new trial based on recanted testimony only if:

> (1) the trial judge is reasonably well-satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006) (citing *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999)); *see also State v. Eric R. Hinton*, No. E2007-00657-CCA-R3-CD, 2008 WL 5206434, at *8 (Tenn. Crim. App. Dec. 15, 2008). On appellate review of the denial of a motion for a new trial based on newly discovered evidence, we employ an abuse of discretion standard of review. *Eric R. Hinton*, 2008 WL 5206434, at *8; *State v. Russell Allen*, No. M2000-01656-CCA-R3-CD, 2001 WL 767003, at *4 (Tenn. Crim. App. July 10, 2001).

In the instant case, the State conceded that Cordell's testimony at trial was mistaken and that the post-trial affidavits from Cordell and the owner of the apartment were true. The State also admitted that the defense, through the exercise of due diligence, could not have known about the falsity of Cordell's testimony because he declined to speak with counsel prior to trial. Thus, the only remaining factor is whether the jury might have reached a different conclusion had it been presented with the truth.

In ruling on the motion for a new trial, the trial court considered the third factor in light of the remaining evidence of premeditation to determine the likely impact on the jury's verdict. The trial court stated:

> [A] knife was used in the attack of both victims. I think the evidence was overwhelming in that regard.
>
> . . . .

-6-

[While] [Ms. Carrier] was out of her apartment, [appellant] had found out where she lived.  [It] [w]as a very small apartment, a garage apartment . . . upstairs, so there [were] steps.

. . . .

[H]e goes to her apartment, allegedly broke a window out.  There was glass found . . . , and the lights were off.

. . . .

[H]e was obviously in the apartment . . . , did not have lights on in the apartment . . . . [T]here was proof that the knife was introduced into the apartment . . . .

. . . .

I think the evidence is rather overwhelming that he went up there to do mischief.

. . . .

I think the evidence was overwhelming of guilt, that it was a first-degree murder and a[n] assault with intent to commit first-degree murder . . . .

I would emphasize again [that] the knife sharpener was not used as a weapon in . . . the killing of . . . the victim or wounding of the . . . surviving victim.

The evidence supports the trial court's conclusion that in light of the overwhelming evidence, the defense failed to establish that had the jury been informed of the truth, it might have reached a different conclusion.  Cordell testified that appellant suspected Ms. Carrier of seeing another man while they were separated.  Appellant told him that "if he caught her with another man[,] he would kill him."  In late November of 2008, Cordell was eating lunch with appellant in appellant's truck.  He noticed a large hunting knife lodged in the seat of the truck and asked appellant why he had it.  Appellant answered, "[I]n case [I] needed to kill someone."  Around the same time, Ms. Carrier admitted to appellant that she had "been talking with another man."  He described that he "sensed a change" in Ms. Carrier; she "started disappearing" and would be unreachable on her cellular telephone.  On December

10, 2008, Ms. Carrier was unreachable on her telephone at 12:22 a.m. Appellant then borrowed a pipe from Cordell and smoked crack cocaine.

Subsequently, appellant, armed with two knives, broke into Ms. Carrier's apartment, remained concealed in the darkness, and confronted Mr. Washburn and Ms. Carrier as they noticed evidence of the burglary and began to retreat from the apartment. He maintained that he kicked in Ms. Carrier's door because in a 4:56 a.m. telephone call, Ms. Carrier indicated that she was at her home and that when he received no response to his repeated knocking on her door, he became concerned that something was wrong. Appellant further claimed that he was provoked into attacking Mr. Washburn by a comment Mr. Washburn made and that he "blacked out" at that point and had no memory of his attacking Mr. Washburn or Ms. Carrier. However, law enforcement personnel testified to statements appellant made at the hospital wherein he recalled his actions and reflected upon the probable result, thus refuting his claim that he had no recollection of his actions.

Questions involving the credibility of the witnesses and resolution of conflicts in the evidence are left to the trial court as the trier of fact. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The trial court, in this case, obviously credited the testimony of Cordell with regard to appellant's statements that could be construed as premeditation and intent. Moreover, the trial court apparently discredited appellant's explanation of his carrying a large knife as being a "memento" to his uncle. We note that although the State highlighted the presence of the knife sharpener at Ms. Carrier's apartment as being indicative of premeditation, there was no testimony that appellant used the sharpener either before or during the attacks on Mr. Washburn and Ms. Carrier. The record is replete with evidence to support that appellant's attacks on Mr. Washburn and Ms. Carrier were premeditated and that the felony murder and aggravated burglary were intentionally committed, even without consideration of the knife sharpener. We cannot discern that the trial court abused its discretion in ruling that this point was not so pivotal that a jury, informed of the truth of the ownership of the knife sharpener, might have reached a different conclusion. Appellant is not entitled to relief on this basis.

## III. Merger

The judgments in this case fail to reflect merger of the convictions for first degree premeditated murder and felony murder. When a defendant is convicted for the same offense under alternate theories, a single judgment of conviction should be entered. *See State v. Addison*, 973 S.W. 2d 260, 267 (Tenn. Crim. App. 1977). Accordingly, we remand this cause for entry of a single judgment form for those convictions.

**CONCLUSION**

Following our review of the record as a whole, the briefs of the parties, the arguments of counsel, and applicable legal authority, we affirm the judgments for attempted first degree murder and aggravated burglary. We affirm the convictions for first degree premeditated murder and felony murder but vacate the judgments and remand the case to the trial court for entry of a single judgment for first degree murder noting merger of the two convictions.

_____
ROGER A. PAGE, JUDGE