IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2025

## MICHAEL TERRELL MCKISSACK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1016     Cynthia Chappell, Judge**

_____

**No. M2024-01110-CCA-R3-ECN**

_____

The Petitioner, Michael Terrell McKissack, appeals the Davidson County Criminal Court's denial of his petition for a writ of error coram nobis, claiming that a codefendant's recanted testimony constitutes newly discovered evidence. Based on our review, we affirm the coram nobis court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

David L. Hudson, Jr., Nashville, Tennessee, for the appellant, Michael Terrell McKissack.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On the morning of January 20, 2010, a group of five young men, one of whom was the Petitioner, robbed a female victim at gunpoint in an apartment complex and attempted to take her vehicle. *See State v. McKissack*, No. M2013-00533-CCA-R3-CD, 2014 WL 2553438, at *3 (Tenn. Crim. App. June 4, 2014), *no perm. app. filed*. Shortly thereafter, they robbed and shot a male victim. *See id*. at *4. The police apprehended the men as they were leaving the apartment complex in a Honda Civic. *See id*. at *2. Inside the Civic, the police found ski masks and bandanas like the ones worn during the robberies and the male victim's wallet. *Id*. at *6. The police found two revolvers, one black and one silver, along the roadway in the direction of the crimes. *See id*. at *6.

The five defendants were indicted for aggravated robbery, robbery, and attempted carjacking, but the Petitioner was tried separately from his codefendants. *Id*. at *3 n.1. At trial, the first victim testified that three men dressed in black ran toward her as she was about to get into her car and leave for work. *Id*. At least two of them were wearing ski masks, and one of them had short dreadlocks. *Id*. One of the men pointed a gun between her eyes and demanded her money, and another man took her backpack. *Id*. at *4. The three men tried to leave in her car, but they could not operate a manual transmission. *Id*. at *3. The second victim testified that after he arrived home from work, two men with guns ran up to him as he was getting out of his car. *Id*. at *4. They were wearing ski masks, and one of them had long dreadlocks and a black gun. *Id*. The other had short dreadlocks and a chrome gun. *Id*. The man with short dreadlocks ordered the second victim onto the ground, took his wallet and cellular telephone, and shot him from two or three feet away. *Id*. The proof at trial established that the Petitioner was the only one of the five men who had short dreadlocks. *Id*.

One of the Petitioner's codefendants, Kevin Boone, testified for the State. *Id*. at *3. On direct appeal of the Petitioner's convictions, this court recounted Mr. Boone's testimony as follows:

> [I]n the early morning hours of January 20, 2010, [Mr. Boone], his twin brother Keith Boone, Kortez Potter Woods, and Mr. Woods's brother, Keith Potter, had been socializing at a basketball game and at clubs. [Kevin Boone] and Mr. Potter had court in the morning, so they were planning to sleep at the same house. Around 1:00 or 2:00 a.m., they went to Mr. Potter's house in Donelson, where the [Petitioner], known as "Ratchett," was apparently asleep. The four men were in Kevin Boone's car, which was a silver, two-door Honda Civic with tinted windows. Mr. Boone's twin, Keith, was driving, and according to Mr. Boone's testimony, Mr. Potter decided to pick up the [Petitioner] and go on a robbing spree.
>
> When they pulled up to Mr. Potter's house, three of the men stayed in the car while Mr. Potter went to wake the [Petitioner]. The two spoke at the front of the house, and the [Petitioner] initially refused to participate in the robberies but eventually relented to Mr. Potter's pressure and went to change clothes. According to Mr. Boone's testimony and photographs of the men at the time of their arrest, the twins were wearing white tops, and the other three men were dressed in all black clothing. Mr. Boone's twin had a .38 special pistol under the passenger's seat, but Mr. Boone did not see any other guns until after the first robbery. The men chose to go to an apartment complex

on the theory that there would likely be someone walking around in the early morning hours.

At the complex, the men saw a woman who would become the first victim, and Mr. Potter instructed Mr. Boone's twin to stop the car. The [Petitioner], Mr. Potter, and Mr. Woods got out, while the Boone twins remained in the vehicle during both crimes. Mr. Woods had a zip-up ski mask, and the [Petitioner] had a camouflage bandana. Although it was still mostly dark, Mr. Boone could see that someone had drawn a gun and aimed it at the first victim, but he could not tell who had the gun. He then saw one of his companions get into the woman's car and start it. Apparently, they could not operate the stick shift, and Mr. Boone saw the car jerk as the attempt to drive it failed. Mr. Woods returned to the car first and informed the twins that they had not gotten anything from the victim.

. . . .

Mr. Boone testified that after the first robbery, Mr. Woods returned to the car. He sat in the front seat and did not get out for the second robbery. Mr. Potter and the [Petitioner] also walked back to the car; however, they did not want to leave without having gained something of value, so they "took off." Mr. Boone at this point saw that the [Petitioner] had a .357 silver revolver.

. . . .

Mr. Boone testified that he wanted to leave after the first robbery, but they waited for the [Petitioner] and Mr. Potter, in part because Mr. Potter's brother was in the car. When they heard a gunshot, they started driving and picked the two up after about five minutes. When the two got in, Mr. Potter sat in the passenger's seat and was shouting, "What the f-ck you shooting for?" They then saw the police coming toward the road into the apartment complex. Mr. Potter asked for the [Petitioner's] gun and threw the gun out of the window. Mr. Boone's twin also gave Mr. Potter a gun which Mr. Potter threw away.

Mr. Boone acknowledged that he was facing significant jail time for the crimes and that he hoped to receive a benefit by testifying. However, he testified that he did not currently have any bargain with prosecutors for his testimony. He also acknowledged having lied during his January 20, 2010 interview with police, where he stated he was asleep during the whole crime.

He also asserted that his prior statement that the [Petitioner] had said he shot the victim because the victim was running was a lie and that, at the time, the [Petitioner] gave no reason for shooting the victim. He acknowledged that he did not come forward with his current version of events until October 2011, and he further acknowledged this was after he had received the State's discovery, which included witness statements.

*Id*. at *3-5 (footnote omitted).

The jury convicted the Petitioner of especially aggravated robbery and aggravated robbery as charged in the indictment and of facilitation of attempted carjacking as a lesser-included offense of attempted carjacking. *Id*. at *6. After a sentencing hearing, the trial court sentenced him to twenty-two years, ten years, and two years, respectively, and ordered that he serve the first two sentences consecutively, for a total effective sentence of thirty-two years. *Id*. This court affirmed the convictions on direct appeal and affirmed the post-conviction court's subsequent denial of post-conviction relief. *McKissack v. State*, No. M2016-02113-CCA-R3-PC, 2017 WL 3822902, at *4, 8 (Tenn. Crim. App. Aug. 31, 2017), *perm. app. denied* (Tenn. Dec. 6, 2017).

On March 15, 2021, the Petitioner filed a pro se petition for a writ of error coram nobis, claiming newly discovered evidence. Specifically, the Petitioner claimed that on December 3, 2020, he received a letter from his trial counsel, stating that on November 20, 2020, Kevin Boone contacted trial counsel and advised trial counsel that he did not testify truthfully and wanted to recant his trial testimony. The Petitioner attached his trial counsel's letter to the petition. The coram nobis court appointed counsel, and counsel filed an amended petition and attached an affidavit signed by Mr. Boone to the amended petition. According to the affidavit, Mr. Boone told the police in January 2010 that he was asleep in his car, the Civic used in the robberies, when the robberies were committed and that he did not see the Petitioner commit any crimes. Mr. Boone also stated in the affidavit that he was coerced to lie at the Petitioner's trial because "I was told by the assistant district attorney . . . that if I did not tell her what she wanted to hear, that she 'would see to it that I would get [f*cked] off.'"

The coram nobis court held a hearing on the petition on April 11, 2024. During the hearing, the assistant district attorney general who represented the State in the robberies testified for the State that she was an Assistant District Attorney General for Rutherford County and had been practicing law for about twenty-five years. In 2012, she was an assistant district attorney in Davidson County and was assigned to prosecute the case against the five defendants. Mr. Woods and Mr. Potter pled guilty, the Petitioner went to trial, and Kevin Boone agreed to testify against the Petitioner. The assistant district attorney general denied telling Mr. Boone that if he did not tell her what she wanted to

hear, she would see to it that he "would get [f*cked] off." She said she would never make that statement to a defendant or a witness and explained, "I have ethical obligations as a lawyer, as a prosecutor, and I would just -- I would never do such a thing. There would be -- that would be something that could get me disbarred. I could lose my job. It's not seeking justice. I mean, there's a multitude of reasons."

On cross-examination, the assistant district attorney general testified that she did not remember speaking with Mr. Boone before the Petitioner's trial. If she talked with Mr. Boone, his attorney and a witness, such as a detective or an investigator, would have been present. She reiterated that she would not have spoken with Mr. Boone without his attorney present.

The assistant district attorney general testified that Mr. Boone received favorable treatment from the State in exchange for his testimony but that she did not remember the specifics of their agreement. Mr. Boone told the police that he was asleep in his car when the robberies were committed. However, she did not believe Mr. Boone could have slept through the robberies because the defendants were getting in and out of the car, were putting on ski masks, and were retrieving weapons. She said that she was certain she never coerced Mr. Boone and that "[h]e was free to make any choices under the advice of his attorney[.]"

Mr. Boone's trial attorney testified for the State that he had been practicing law, mostly criminal law, in Davidson County, for twenty-five years. He said that he did not have any independent recollection of representing Mr. Boone in the robberies case but that he recalled working with the assistant district attorney general "[a] lot." The State asked him to describe her character, and he said her character was "[o]utstanding" and "beyond reproach." He said he never heard her threaten a witness. If the assistant district attorney general had spoken with Mr. Boone, Mr. Boone's trial counsel would have been present.

On cross-examination, Mr. Boone's trial counsel testified that Mr. Boone should have come to him if Mr. Boone felt coerced. Trial counsel said he did not recall Mr. Boone ever expressing that Mr. Boone felt coerced to testify against the Petitioner.

The coram nobis court continued the hearing until May 30, 2024, in order for Mr. Boone to testify. Mr. Boone testified for the Petitioner that Mr. Boone was eighteen years old in 2010. The night before the robberies, Mr. Boone, his twin brother, Kortez Potter, and Keith Potter "went out drinking." Mr. Boone consumed alcohol and Xanax bars. The four of them were planning to go to Mr. Potter's house and got into Mr. Boone's Civic, which had a manual transmission. Only Mr. Boone and his brother knew how to drive a "stick shift." Mr. Boone was too tired to drive, so he let his brother drive. Mr. Boone got into the backseat behind his brother and "pass[ed] out." Mr. Boone later heard "some

commotion" but was "in and out of sleep." He said he did not even know the Petitioner was in the Civic until the police pulled the car over.

Mr. Boone testified that no one saw him, or his twin brother involved in the robberies but that all five of the defendants "got locked up." Six months later, Mr. Boone saw discovery in his case and did not understand why he was still in jail because he did not participate in the robberies. Mr. Boone's mother retained his trial counsel, and trial counsel told Mr. Boone that Mr. Boone did not have anything to worry about. Trial counsel later told Mr. Boone that the assistant district attorney general wanted to speak with Mr. Boone, and Mr. Boone agreed to meet with her. Mr. Boone's trial counsel was present at the meeting, and the assistant district attorney general asked Mr. Boone what happened. Mr. Boone told her about being asleep during the robberies, but she responded, "I don't want to hear that [sh*t]."

Mr. Boone testified that the assistant district attorney general was "aggressive" and did not want to hear the truth. She told him, "[L]ook, either you can tell me what I want to know or I'm going to [f*ck] you off." Mr. Boone was "shocked." The assistant district attorney general left the room so that the Mr. Boone could talk with his trial counsel, and trial counsel told Mr. Boone, "[L]ook, man, just go on [and] tell her what she want[s] to hear." Mr. Boone was only eighteen years old and had never been in jail before, so he "went along with the paperwork." He stated, "I can't say [the Petitioner] did it if I was asleep because I ain't witness it." However, Mr. Boone felt pressured to say otherwise. Moreover, his Civic was parked on one side of the apartment complex, and "the stuff happened on the other side of the apartments." Therefore, he could not have seen the robberies.

On cross-examination, Mr. Boone acknowledged that he took an oath at trial and at the coram nobis hearing to tell the truth. He also acknowledged that some of his trial testimony was true. For example, he and his brother were wearing white shirts, and the other three defendants were wearing black shirts. He said, though, that he was asleep when his brother drove the Civic to the Petitioner's house and that his testimony about everything that occurred after they picked up the Petitioner was untrue because he was asleep "the whole time." Mr. Boone remembered hearing a gunshot and hearing his brother in the front seat, but then he "passed back out." He woke when a police officer told him to get out of the backseat of the Civic, and he learned about the robberies from his discovery materials.

At the conclusion of the hearing, the State acknowledged that Mr. Boone was a "key" witness against the Petitioner but asserted that the State could have procured a conviction without his testimony, noting that the Petitioner was in the Civic when the police stopped the car and that he matched the description of one of the robbers. The State also

asserted that the court should accredit the testimony of the assistant district attorney general and Mr. Boone's trial counsel. The coram nobis court took the matter under advisement.

On June 26, 2024, the coram nobis court entered a written order denying the petition for a writ of error coram nobis. Although not raised by either party, the coram nobis court addressed the timeliness of the petition. The court found that Mr. Boone's recantation did not constitute newly discovered evidence of actual innocence because there was additional evidence to convict the Petitioner and, therefore, that equitable tolling of the one-year statute of limitations was not warranted. Nevertheless, the court went on to address the merits of the petition. The coram nobis court found the assistant district attorney general and Mr. Boone's trial counsel credible, found Mr. Boone not credible, and found that Mr. Boone's claim of being asleep during the robberies was "untruthful" and "implausible." Moreover, the court recalled that Mr. Boone's new testimony placed the Petitioner near the scene of the crimes, that eyewitnesses testified the shooter had short dreadlocks, and that the Petitioner was the only one of the five defendants to have short dreadlocks. In sum, the coram nobis court concluded that it was not reasonably well satisfied that Mr. Boone's old testimony was false and that his new testimony was true and did not find that the jury may have reached a different verdict without Mr. Boone's trial testimony. Accordingly, the coram nobis court denied coram nobis relief.

## ANALYSIS

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> (b) … Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

> (c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c); *see State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007) (stating that the standard of review is "whether a reasonable basis exists for

concluding that had the evidence been presented at trial, the result of the proceedings might have been different").

A petition for writ of error coram nobis:

may be granted only when the coram nobis petition is in writing, describes "with particularity" the substance of the alleged newly discovered evidence, and demonstrates that it qualifies as newly discovered evidence. *Payne v. State*, 493 S.W.3d 478, 484-85 (Tenn. 2016) (citing [*Harris v. State*, 301 S.W.3d 141, 152 (Tenn. 2010)] (Koch, J., concurring)). In order to qualify as newly discovered evidence, "the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible." *Id*.

*Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018).

Recanted testimony may be considered newly discovered evidence under certain circumstances. *See Mixon*, 983 S.W.2d at 672. A trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

(1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006) (citing *Mixon*, 983 S.W.2d at 666).

Initially, although not addressed by either party below or on appeal, the coram nobis court recognized a problem with the Petitioner's coram nobis petition: timeliness. A petition for a writ of error coram nobis must be filed within one year after the judgment becomes final. Tenn. Code Ann. § 27-7-103. For the purposes of coram nobis relief, a judgment becomes final thirty days after the entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. *Mixon*, 983 S.W.2d at 670. Timeliness of the petition is not an affirmative defense, so the petition must show on its face that it is timely. *Nunley*, 552 S.W.3d at 828. However, the one-year statute of limitations may be tolled on due process grounds. *Id*. at 828-29 (citation omitted).

The Petitioner obviously filed his petition for a writ of error coram nobis outside the one-year statute of limitations, but he never requested that the limitations period be tolled. The Petitioner also did not offer an explanation for why due process required tolling. The day before the coram nobis court entered its order denying relief, our supreme court filed its opinion in *Clardy v. State*, 691 S.W.3d 390 (Tenn. 2024). In *Clardy*, which the coram nobis court cited in its order, our supreme court clarified that "the coram nobis statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is *actually innocent* of the underlying crime of which he was convicted." 691 S.W.3d at 407 (emphasis added).

> If a petition for a writ of error coram nobis fails to show on its face either that it has been timely filed in accordance with Tennessee Code section 27-7-103 or specific facts showing why the petitioner is entitled to equitable tolling of the statute of limitations, the trial court is within its discretion to summarily dismiss it.

*Nunley*, 552 S.W.3d at 829. Although the decision to grant or deny coram nobis relief rests within the sound discretion of the trial court, *see Vasques*, 221 S.W.3d at 527-28, "[w]hether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Nunley*, 552 S.W.3d at 830 (citation omitted).

Here, while Mr. Boone's testimony that the assistant district attorney general coerced him to lie may have been new, Mr. Boone's claim that he was asleep at the time of the robberies was not new evidence. Mr. Boone acknowledged at the Petitioner's trial that he told the police on the day of the crimes that he was asleep during the robberies. Moreover, even if true, that evidence does not establish clearly and convincingly that the Petitioner is actually innocent of the crimes. *See Clardy,* 691 S.W.3d at 407. The police found the Petitioner in the car with his four codefendants soon after the robberies. Items used to commit robberies, along with the second victim's wallet, were in the car. Both victims testified that one of the robbers had short dreadlocks, and the second victim testified that the robber with the short dreadlocks shot him. The Petitioner was the only man in the car with short dreadlocks. Thus, the coram nobis court correctly determined that due process tolling was not warranted. Upon determining that the statute of limitations should not be tolled, the coram nobis court could have summarily dismissed the petition without a hearing. *Nunley,* 552 S.W.3d at 829.of the

Although the petition was untimely, the coram nobis court addressed the petition on the merits and determined under the first and third prongs for granting coram nobis relief upon the basis of newly discovered recanted testimony that the Petitioner was not entitled to relief. As to the first prong, the coram nobis court was in the best position to evaluate

Mr. Boone's credibility to determine whether his trial testimony was false and the new testimony is true, and we may not reassess that credibility determination. Regarding the third prong, whether the jury might have reached a different conclusion had the truth been told, the record supports the coram nobis court's determination that there was sufficient additional evidence of the Petitioner's guilt without Mr. Boone's testimony. The Petitioner was in the getaway car with the other defendants; ski masks, a bandana, and the second victim's wallet were in the car; the police found two guns matching the descriptions of the two guns used in the robberies in the roadway near the car; and the Petitioner's clothing and hairstyle matched the description of one of the robbers. The Petitioner failed to establish by clear and convincing evidence that he was actually innocent of the crimes for which he was convicted. The coram nobis court did not abuse its discretion by denying the petition.

## **CONCLUSION**

Upon review, we affirm the judgment of the coram nobis court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE